**In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY PERTAINING TO the CASINO GAMING INITIATIVE ADOPTED ON APRIL 21, 1982; and Petition for Rehearing Denied May 25, 1982.**

**Richard J. SPELTS and Walter J. Boigegrain, Petitioners,**

**v.**

**Robert C. KLAUSING and the Committee for Economic Development and Tax Relief, Proponents,**

**and**

**The State Title Setting Review Board, Respondents.**

**No. 82SA253.**

Supreme Court of Colorado, En Banc.

July 29, 1982.

Vanatta, Spelts & McGuire, P. C., Richard J. Spelts, Scott F. Sullan, Michael T. DePinto, Denver, for petitioners and No Casino Gambling, Inc.

Lee N. Sternal, P. C., Lee N. Sternal, Pueblo, for proponents Klausing and the Committee for Economic Development and Tax Relief.

J. D. MacFarlane, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Kristie Hansen, Asst. Atty. Gen., Gen. Legal Services Section, Denver, for the State of Colo.

DUBOFSKY, Justice.

This is an original proceeding brought under section 1–40–102(3), C.R.S.1973 (1980 Repl.Vol. 1B) by qualified electors, Richard J. Spelts and Walter J. Boigegrain (Petitioners). They challenge the denial of their motion for rehearing by the Initiative Title Setting Review Board (Board)[1] regarding the titles, summary, and submission clause fixed by the Board for an initiative proposed by Robert C. Klausing and the Committee for Economic Development and Tax Relief (Proponents) to amend the Colorado Constitution to allow casino gaming.[2]

The Petitioners contend that the summary does not explain the fiscal impact of the initiative as required by section 1–40–101(2), C.R.S.1973 (1980 Repl. Vol. 1B); that the references to Southern Colorado Eco-

---

1. The Initiative Title Setting Review Board is composed of the Secretary of State, the Director of the Legislative Drafting Office, and the Attorney General.

2. The titles, summary, and submission clause fixed by the Board, as well as the text of the proposed initiative, are set forth in full in Appendices A and B.

nomic Development District in the titles, submission clause, and summary are misleading; that the titles, submission clause, and summary do not accurately reflect the true meaning and intent of the initiative in several respects; and that the Board acted in excess of its jurisdiction by deleting a paragraph from the proposed initiative. We have reviewed each of the Petitioners' contentions and conclude that the Board's action in denying the motion for rehearing should be affirmed.

██ Article V, Section 1 of the Colorado Constitution reserves to the People the right of initiative, and section 1–40–101(2), C.R.S.1973 (1980 Repl. Vol. 1B) establishes the duties of the Board. The Board sets an initiated measure's title which shall correctly and fairly express the true intent and meaning of the proposed measure, be brief, and unambiguously state the principle of the proposal. The Board also prepares a summary of the initiative which shall be clear, concise, and a true and impartial statement of the intent of the proposal. The summary shall not be an argument, nor likely to create prejudice, for or against the measure. *In the Matter of the Title, Ballot Title and Submission Clause, and Summary Pertaining to the Sale of Table Wine in Grocery Stores Initiative*, Colo., 646 P.2d 916 (1982). If in the opinion of the Board the proposed initiative will have a fiscal impact on the State or any of its political subdivisions, the summary shall include an estimate and explanation of the fiscal impact. *In re Second Initiated Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees of 1980*, Colo., 613 P.2d 867 (1980).

██ This Court's evaluation of the legal sufficiency of a ballot title is circumscribed by the following well-established principles:

(1) [W]e must not in any way concern ourselves with the merit or lack of merit of the proposed [initiative] since, under our system of government, that resolution rests with the electorate;

(2) All legitimate presumptions must be indulged in favor of the propriety of the Board's action; and

(3) Only in a clear case should a title prepared by the Board be held invalid.

*Bauch v. Anderson*, 178 Colo. 308, 310, 497 P.2d 698, 699 (1972); *In the Matter of the Title, Ballot Title and Submission Clause, and Summary Pertaining to the Sale of Table Wine in Grocery Stores Initiative, supra; In the Matter of the Title, Ballot Title and Submission Clause, and Summary Including the Estimate of Fiscal Impact and Explanation Thereof Pertaining to the Mineral Production Tax Initiative*, 644 P.2d 20 (Colo.1982); *In the Matter of the Title, Ballot Title, Submission Clause and Summary Pertaining to the Branch Banking Initiative*, Colo., 612 P.2d 96 (1980); *In the Matter of the Proposed Initiative on Transfer of Real Estate*, Colo., 611 P.2d 981 (1980); *In re An Initiated Constitutional Amendment Respecting Rights of the Public to Uninterrupted Service by Public Employees*, 199 Colo. 409, 609 P.2d 631 (1980).

## I.

The Petitioners first contend that the summary does not explain the fiscal impact of the initiative as required by section 1–40–101(2), C.R.S.1973 (1980 Repl. Vol. 1B). Section 1–40–101(2) provides:

... [I]f, in the opinion of the board, the proposed law or constitutional amendment will have a fiscal impact on the state or any of its political subdivisions, [the board] shall request assistance in such matter from the division of budgeting or the department of local affairs. ... [T]he division of budgeting, and the department of local affairs, shall furnish any assistance so requested, and the summary shall include an estimate of any such fiscal impact, together with an explanation thereof.

██ The Petitioners maintain that the Board violated the statute by not requesting information on fiscal impact from the Department of Local Affairs. At the May 25, 1982, hearing on the Petitioners' motion for rehearing, the chair of the Board stated that he had considered the issue before the title hearing and decided that the Office of

State Planning and Budgeting (OSPB) could obtain the needed information. The decision of whether and from which of the two state agencies to request information is within the discretion of the Board, and the record does not indicate that the Board improperly exercised its discretion. *See In the Matter of the Title, Ballot Title and Submission Clause, and Summary Including the Estimate of Fiscal Impact and Explanation Thereof Pertaining to the Mineral Production Tax Initiative, supra.*

The estimate of fiscal impact prepared by OSPB relied on experience with casino gambling in Nevada and New Jersey gathered from telephone calls, and newspaper and magazine articles. The fiscal impact statement, based on the estimate, provided:

The fiscal impact of this measure would be indeterminate because the scope and nature of casino gaming in Colorado could vary widely depending upon implementing legislation and upon actions by voters in local elections to approve casino gaming.

On May 10, 1982, the Petitioners, by letter, requested the Board to obtain fiscal impact estimates from the county commissioners, the district attorney, and the police chief in the county seat of those counties proposed to be initially eligible for the establishment of gaming casinos. At the Board's hearing on May 25, 1982, the Petitioners renewed their request for supplemental information to estimate the fiscal impact of the initiative. The Board denied the request on the basis that responses from county officials would not eliminate the variables which made the fiscal impact indeterminate.

■ The situation here is similar to that in *In the Matter of the Title, Ballot Title and Submission Clause, and Summary Pertaining to the Sale of Table Wine in Grocery Stores Initiative, supra,* where the Board was of the opinion that no additional information would be available to permit them to make a more definitive statement concerning fiscal impact. Under those circumstances, we ruled that the Board properly exercised its judgment in concluding

that the fiscal impact upon local government could not be determined because of the variables involved. Here, also, the Board found that the fiscal impact of the proposed amendment was subject to variables and correctly denied the Petitioners' request for supplemental information. *See In re Second Initiated Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees of 1980, supra; In re An Initiated Constitutional Amendment Respecting Rights of the Public to Uninterrupted Service by Public Employees, supra.*

■ The Petitioners next argue that they were denied the right to question the author of the OSPB fiscal impact estimate in violation of their due process rights under the Fourteenth Amendment to the United States Constitution and Article II, Section 25 of the Colorado Constitution, and in violation of the State Administrative Procedure Act, section 24–4–105(4), C.R.S.1973 (1981 Supp.) which provides that "[a]ll parties to the [adjudicatory] proceeding shall also have the right to cross-examine witnesses who testify at the [adjudicatory] proceeding." The Petitioners also assert that the Board allowed questioning of the author of a fiscal impact estimate at a hearing on another ballot title, and that to deny similar questioning at this proceeding was a denial of equal protection.

The estimate of fiscal impact furnished by the OSPB contained a statement that its author would appear at the hearing. The author, an OSPB employee, did attend but left without testifying before the Board considered the fiscal impact statement near the end of the lengthy hearing. When a member of the Board asked one of the Petitioners if he was requesting a continuance of the hearing until the next day in order to question the author of the fiscal impact estimate, the Petitioner responded that he was not asking for a continuance. Under such circumstances, the Petitioners' due process and equal protection arguments are without foundation.

## II.

The proposed initiative provides that a local election to permit gaming may be held in any county located in the Southern Colorado Economic Development District, and the initiative lists nineteen counties in southeastern Colorado and the San Luis Valley as located in the Southern Colorado Economic Development District.[3] The petition for rehearing disclosed that in August, 1980, the Southern Colorado Economic Development District was reduced to thirteen counties, when Alamosa, Conejos, Costilla, Mineral, Rio Grande and Saguache Counties formed the San Luis Valley Economic Development District.

The Petitioners contend that the use of the name "Southern Colorado Economic Development District" in the titles, submission clause and summary is unfair and does not clearly express the true meaning and intent of the initiative when counties no longer in the Southern Colorado Economic Development District are included among the counties initially eligible for gaming casinos. The Board concluded that the use of the name "Southern Colorado Economic Development District" in the titles, submission clause, and summary was fair and expressed the meaning and intent of the initiative because the initiative's text listed the counties affected and anyone who questioned which counties were included in the district for purposes of the proposal could consult the text of the initiative. The words selected by the Board are presumed proper, and nothing in the record persuades us that the Board's language is improper, unfair, or prejudicial. *Bauch v. Anderson, supra.*

In addition, the Petitioners argue that the use of the name "Southern Colorado Economic Development District" is a "catch phrase," forbidden in ballot titles under *Say v. Baker*, 137 Colo. 155, 322 P.2d

317 (1958). A "catch phrase" consists of "words which could form the basis of a slogan for use by those who expect to carry out a campaign for or against an initiated constitutional amendment." *Id.* at 320. The words "Southern Colorado Economic Development Association" do not constitute a slogan forbidden under *Say v. Baker.*

## III.

The Petitioners next assert that the constitutional right to a free and open election guaranteed by Article II, Sec. 5 of the Colorado Constitution is violated by the use of the term "Southern Colorado Economic Development District" in the titles, submission clause, and summary, and by the omission of an adequate fiscal impact statement from the summary. The Petitioners argue that the misleading information conveyed by the use of the name "Southern Colorado Economic Development District" and the use of the word "indeterminate" to describe the fiscal impact of the initiative constitute government interference with an informed discussion of issues by the electorate.

This argument is no different in substance than the Petitioners' arguments that the summary did not adequately explain the fiscal impact of the initiative, addressed in Part I of this opinion, and that the use of the development district name was misleading, addressed in Part II, *supra.* Our conclusions in these preceding sections that the Board's actions were proper dictate that they were also not so misleading as to abrogate the People's free election rights. This conclusion is buttressed by the presumption of propriety in the Board's actions, *Bauch v. Anderson, supra*, one purpose of which is to protect the strong constitutional interest in the People's right to initiate constitutional amendments. *McKee v. City of Louisville*, 616 P.2d 969 (1980).

---

**3.** The Southern Colorado Economic Development District was formed to implement provisions of the Public Works and Economic Development Act of 1965 and is an economic development district as defined in 13 C.F.R. § 301.2 (1982). The boundaries of an economic development district may be modified to include or exclude counties. 13 C.F.R. § 303.6. In April, 1980, the nineteen counties in the district included Pueblo, Huerfano, Costilla, Las Animas, Baca, Prowers, Bent, Crowley, Kiowa, Otero, Custer, Lake, Chaffee, Saguache, Rio Grande, Alamosa, Conejos, Mineral, and Fremont.

Therefore, the titles, submission clause and summary do not interfere with the right to a free and open election.

### IV.

The Petitioners advance several other criticisms of the language selected by the Board for the titles, submission clause, and summary.

The Petitioners note that the title and submission clause condition casino gaming "upon approval at local elections," while the summary refers to "approval of the voters." They argue that because the proponents of the initiative changed the language in the final draft from "a local election shall be held" to "a local election may be held," the initiative is ambiguous on whether elections are required before casino gaming may be held in the county, and that the titles, submission clause, and summary are incorrect in conveying the impression that voter approval is required. Section 2(8) of the proposed initiative reads:

> Any provision of this constitution to the contrary notwithstanding, a local election may be held in any county located in Southern Colorado Economic Development District counties ... and other counties defined by the General Assembly as economically depressed, and resort areas of any county in the State as such resort areas are defined by the General Assembly, for approval by the registered electors before casino gaming is permitted by ordinance within the boundaries of said counties.

The Petitioners also contend that the use of the word "regulate" in the titles and submission clause and the use of the word "license" in the summary are inaccurate because neither "regulate" nor "license" appears in the text of the initiative. The titles and submission clause refer to "the appointment of a five-member gaming commission to regulate casino gaming ...", and the summary reads, "[t]welve percent of the gross proceeds from licensed casino gaming...." The corresponding language of the initiative is as follows:

Section 2, subsection (10)(a),

"[t]welve percent of the gross proceeds ... from casino gaming operations licensed pursuant to subsection (6) of this section;"

section 2, subsection (6),

"[t]he administration and enforcement of subsections (8) to (10) shall be under a gaming commission...."

Finally, the Petitioners allege that the titles, submission clause, and summary fail to disclose that the gaming commission may add other types of gaming to those specifically allowed by the initiative, and that the titles, submission clause and summary are misleading when they refer to distribution of twelve percent of the proceeds from gaming for public purposes. Section 2, subsection 10(a) of the initiative refers to payment from casinos to the gaming commission of "twelve percent of the gross proceeds as defined by the General Assembly ...." The next sentence provides that "four percent of the gross proceeds collected pursuant to this subsection (10)" shall be available for property tax relief. Succeeding sentences provide that "two percent of the proceeds collected pursuant to this subsection (10)" shall be available to each of four specified public purposes.[4] Although the Proponents, at the hearings before the Board, stated their intent as requiring that four percent of the gross proceeds be available for property tax relief and two percent of the proceeds be available for each of the four specified public purposes, the Petitioners argue that the initiative can be read to mandate only four percent of the twelve percent gross proceeds for property tax relief and two percent of the twelve percent for public purposes.

The Petitioners ask us to invalidate the titles, submission clause, and summary because they allegedly do not reflect the true meaning of the initiative. The

---

4. The initiative establishes that two percent of the proceeds shall be remitted to the general fund for public education, two percent for so- cial services, two percent for highways, and two percent for development of water resources.

Petitioners argue that it was not sufficient for the Board to ascertain the intent of the Proponents; rather, the Petitioners assert, the Board must make an independent determination of the true meaning of the language used in the initiative.[5] However, we have held that it is not our function in this review proceeding, nor is it the Board's function, to determine the meaning of the language of the initiative; a judicial interpretation of the meaning of the initiative must await an adjudication in a specific factual context. *In the Matter of the Title, Ballot Title, and Submission Clause, and Summary Including the Estimate of Fiscal Impact and Explanation Thereof Pertaining to the Mineral Production Tax Initiative, supra; In the Matter of the Proposed Initiative on Transfer of Real Estate, supra.*

In addition, the Petitioners seek to overturn the titles, submission clause and summary because they do not mention every effect of or problem with the proposal. We note, however, that there is no requirement that every possible effect be included within the title of the ballot title and submission clause. *In the Matter of the Title, Ballot Title and Submission Clause, and Summary Pertaining to the Sale of Table Wine in Grocery Stores Initiative, supra; In re the Title, Ballot Title, Submission Clause, and Summary Pertaining to the Branch Banking Initiative, supra.* Moreover, we can only consider whether the titles, submission clause, and summary reflect the intent of the initiative, not whether they reflect all possible problems that may arise in the future in applying the proposed language. *In the Matter of the Title, Ballot Title and Submission Clause, and Summary Pertaining to the Sale of Table Wine in Grocery Stores Initiative, supra; In the Matter of the Proposed Initiative on Transfer of Real Estate, supra.* Based on our review of the hearings before the Board, we conclude that the titles, submission clause, and summary are fair, true and impartial.

## V.

Finally, the Petitioners maintain that the Board exceeded its jurisdiction by deleting the first paragraph of the proposed initiative in violation of section 1–40–101(1), C.R. S.1973 (1980 Repl. Vol. 1B, 1981 Supp.) which provides:

The original drafts of all initiative petitions ..., before they are signed by the electors or any of them, shall be submitted by the proponents of the petition to the directors of the legislative council and the legislative drafting office for review and comment.... No later than two weeks after the date of submission of the original draft, ... the directors of the legislative council and the legislative drafting office shall render their comments to the proponents of the petition concerning the format or contents of the petition at a meeting open to the public.... After the public meeting but before submission to the secretary of state for title setting, the proponents may amend the petition in response to some or all of the comments of the directors of the legislative council and the legislative drafting office.

At the first Board hearing, the Board called the attention of the Proponents to section 1 of the initiative which provided:

At the next general election for members of the General Assembly, there shall be submitted to the registered electors of the state of Colorado, for their approval or rejection, the following amendment to the Constitution of the State of Colorado to wit:

The director of the Legislative Drafting Office noted that the language used was the language included in concurrent resolutions of the General Assembly forwarding constitutional amendments proposed by the General Assembly to the people for a vote. The director believed the inclusion of this language in the body of the initiative would require the submission of the proposed constitutional amendment on casino gaming to

5. Section 1-40 -101(2) (1980 Repl. Vol. 1B) provides that the title "shall correctly and fairly

express the true intent and meaning" of the proposed constitutional amendment.

the people for a vote every two years.[6] The Proponents had not realized that the effect of basing their initiative on the form for concurrent resolutions would produce an unwanted submission of the casino gaming amendment to the voters every two years. Therefore, the Board deleted section 1, paragraph 1 as a technical error subject to correction. The Board also corrected several other spelling errors and section enumeration errors in the final text of the Proponents' proposed constitutional amendment.

The Petitioners argue that the Board's correction of the initiative text after the Proponents had submitted it to the Secretary of State for a title violates section 1–40–101(1). The Petitioners wish us to restore the language requiring a review of casino gaming by the voters at every general election and to direct the Proponents to re-circulate their petitions containing the restored language. The practical effect of such an order would prevent the Proponents from obtaining the necessary signatures[7] and filing the petition with the Secretary of State at least three months before this Fall's election, as required by section 1–40–104, C.R.S.1973 (Repl. Vol. 1B, 1981 Supp.).

█ Because the directors of the Legislative Drafting Office and Legislative Council failed to point out this problem to the Proponents of the initiative, we believe that the situation is similar to that in *In re Second Initiated Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees, supra,* where the hearing on the titles, submission clause, and summary of an initiated measure was begun but not completed by the statutorily required date. There, we held that a continuance to the next day in order to comply fully with other statutory requirements did not frustrate the purpose of the statute. Similarly, here, we believe that allowing a technical correction of the proposed initiative to conform with the intent of the Proponents does not frustrate the purpose of the statute. To invalidate this initiative on the basis of the Board's technical correction of a previously unrecognized error, when the correction is made at the beginning of a hearing on the titles, submission clause, and summary, rather than before the petition was submitted to the Secretary of State for title-setting, would be contrary to the spirit of our constitutional right of initiative. *In re Second Initiated Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees of 1980, supra.* See Part III, *supra.*

Accordingly, we affirm the ruling of the Initiative Title Setting Review Board denying the Petitioners' motion for rehearing.

### APPENDIX A

### BALLOT TITLE, SUBMISSION CLAUSE AND SUMMARY

### PROPOSED INITIATIVE ON CASINO GAMING

The title as designated and fixed by the Board is as follows.

AN AMENDMENT TO THE COLORADO CONSTITUTION PROVIDING FOR THE CONDUCT OF CASINO GAMING ON AND AFTER JANUARY 1, 1984, UPON APPROVAL AT LOCAL ELECTIONS, IN COUNTIES OF THE SOUTHERN COLORADO ECONOMIC DEVELOPMENT DISTRICT AND SUCH RESORT AREAS AND ECONOMICALLY DEPRESSED COUNTIES AS ARE DEFINED BY THE GENERAL ASSEMBLY; DIRECTING THE APPOINTMENT OF A FIVE–MEMBER GAMING COMMISSION TO REGULATE CASINO GAMING; PROVIDING FOR THE DISTRIBUTION OF TWELVE PERCENT OF THE PROCEEDS OF CA-

---

6. Apparently, the directors of the Legislative Council and Legislative Drafting Office at their earlier meeting with the Proponents had not mentioned the problem with section 1.

7. Section 1–40–105, C.R.S.1973 (Repl.Vol. 1B, 1981 Supp.) requires an initiative petition to contain a number of signatures equal to at least five percent of the total number of votes for all candidates for the office of Secretary of State in the preceding general election.

SINO GAMING FOR PUBLIC PUR-
POSES; AND DIRECTING THE GENER-
AL ASSEMBLY TO ENACT LAWS TO
IMPLEMENT THE AMENDMENT.

The ballot title and submission clause as
designated and fixed by the Board is as
follows:

SHALL THE COLORADO CONSTITU-
TION BE AMENDED: TO PROVIDE
FOR THE CONDUCT OF CASINO GAM-
ING ON AND AFTER JANUARY 1, 1984,
UPON APPROVAL AT LOCAL ELEC-
TIONS, IN COUNTIES OF THE SOUTH-
ERN COLORADO ECONOMIC DEVEL-
OPMENT DISTRICT AND SUCH RE-
SORT AREAS AND ECONOMICALLY
DEPRESSED COUNTIES AS ARE
DEFINED BY THE GENERAL ASSEM-
BLY; TO DIRECT THE APPOINTMENT
OF A FIVE–MEMBER GAMING COMMIS-
SION TO REGULATE CASINO GAMING;
TO PROVIDE FOR THE DISTRIBUTION
OF TWELVE PERCENT OF THE PRO-
CEEDS OF CASINO GAMING FOR PUB-
LIC PURPOSES; AND TO DIRECT THE
GENERAL ASSEMBLY TO ENACT
LAWS TO IMPLEMENT THE AMEND-
MENT?

The summary prepared by the Board is as
follows:

The amendment would make casino gaming
lawful on and after January 1, 1984. It
would provide for the appointment of a
five-member gaming commission to admin-
ister and enforce constitutional provisions
related to casino gaming. The commission
would be appointed by a committee com-
posed of the Speaker of the House of Rep-
resentatives, the President of the Senate,
the Majority and Minority Party Leaders of
each House of the General Assembly, and
the Governor, and would be subject to con-
firmation by the Senate. Qualifications,
compensation, terms of office, powers,
duties, and staff of the commission would
be set by the General Assembly.

A local election to permit casino gaming
could be held in any county of the Southern
Colorado Economic Development District, in
such other counties as the general assembly
determined to be economically depressed,
and in resort areas defined by the general
assembly. Upon approval by the voters,
casino gaming would be permitted by ordi-
nance in such counties.

"Casino gaming" is defined to mean any
banking or percentage game played with
cards, dice, or any mechanical device or
machine for anything of value but specifi-
cally excludes bingo, lotto, and raffles, op-
erated by charitable or educational organi-
zations and social games participated in by
individuals from which no one receives any
gain except his winnings.

Twelve percent of the gross proceeds from
licensed casino gaming would be paid to the
gaming commission. Unless otherwise pro-
vided by statute, the commission would dis-
tribute the proceeds for property tax relief
in counties which authorize casino gaming,
and for public education, social services,
state highways, and water resources. The
state would be permitted to deduct a rea-
sonable fee, determined by the general as-
sembly, to defray costs of collection and
distribution of revenues. In addition, the
commission could assess a reasonable fee on
casino operations for administration and en-
forcement.

The general assembly would be directed to
enact such laws as were necessary to imple-
ment the provisions of the amendment by
January 1, 1984.

The fiscal impact of this measure would be
indeterminate because the scope and nature
of casino gaming in Colorado could vary
widely depending upon implementing legis-
lation and upon actions by voters in local
elections to approve casino gaming.

APPENDIX B

TEXT OF INITIATIVE

STATE OF COLORADO

INITIATIVE NO.

Be It Enacted by the People of the
State of Colorado

SECTION 1. At the next general elec-
tion for members of the general assembly,

there shall be submitted to the registered electors of the State of Colorado, for their approval or rejection, the following amendment to the Constitution of the State of Colorado, to-wit:

Section 2(1), (5), and (6) of Article XVIII of the Constitution of the State of Colorado are amended, and the said section 2 is further amended BY THE ADDITION OF THE FOLLOWING NEW SUBSECTIONS, (8) to (10) to read:

Section 2. Lotteries prohibited—exceptions. (1) The general assembly shall have no power to authorize lotteries for any purpose; except that the conducting of such games of chance as provided in subsections (2) to (4) of this section shall be lawful on and after January 1, 1959, and the conducting of state-supervised lotteries pursuant to subsection (7) of this section shall be lawful on and after January 1, 1981, AND THE CONDUCTING OF CASINO GAMING AS PROVIDED IN SUBSECTIONS (8) TO (10) OF THIS SECTION SHALL BE LAWFUL ON AND AFTER JANUARY 1, 1984.

(5) Subsections (2) to (4) AND (8) TO (10), of this section are self enacting, but laws may be enacted supplementary to and in pursuance of, but not contrary to, the provisions thereof.

(6) The enforcement of SUBSECTIONS (2) TO (4) AND (7) of this section shall be under such official or department of the Government of the State of Colorado as the general assembly shall provide. THE ADMINISTRATION AND ENFORCEMENT OF SUBSECTIONS (8) TO (10) SHALL BE UNDER A GAMING COMMISSION COMPOSED OF FIVE MEMBERS WHO SHALL BE APPOINTED BY A COMMITTEE COMPOSED OF THE SPEAKER OF THE HOUSE, MAJORITY LEADER OF THE HOUSE, MINORITY LEADER OF THE HOUSE, PRESIDENT OF THE SENATE, MAJORITY LEADER OF THE SENATE, MINORITY LEADER OF THE SENATE, AND THE GOVERNOR OF THE STATE SUBJECT TO CONFIRMATION BY THE SENATE OF THE GENERAL ASSEMBLY. THE QUALIFICATIONS OF THE MEMBERS OF THE COMMISSION, THEIR COMPENSATION, AND TERM OF OFFICE SHALL BE AS THE GENERAL ASSEMBLY SHALL PROVIDE. THE POWERS, DUTIES, AND STAFF OF THE GAMING COMMISSION SHALL BE THOSE AS THE GENERAL ASSEMBLY SHALL PROVIDE.

(8) Any provision of this constitution to the contrary notwithstanding, a local election may be held in any county located in Southern Colorado Economic Development District Counties which are Pueblo, Huerfano, Costilla, Las Animas, Baca, Prowers, Bent, Crowley, Kiowa, Otero, Custer, Lake, Chaffee, Saguache, Rio Grande, Alamosa, Conejos, Mineral, Fremont, and other counties defined by the general assembly as economically depressed, and resort areas of any county in the State as such resort areas are defined by the general assembly, for approval by the registered electors before casino gaming is permitted by ordinance within the boundaries of said counties.

(9) As used in this section:

(a) "Casino gaming" means any banking or percentage game played with cards, dice, or any mechanical device or machine for money, property, checks, credit, or any representative or value, including, without limiting the generality of the foregoing, faro, monte, roulette, keno, twenty-one, blackjack, seven-and-a-half, big injun, klondike, craps, poker, chuck-a-luck, Chinese chuck-a-luck (dai shu), wheel of fortune, chemin de fer, baccarat, pai gow, beat the banker, panguingui, slot machine, or any other game or device approved by the commission but does not include bingo or lotto and raffles operated by charitable or educational organizations pursuant to subsections (2) to (4) of this section, or games which are operated under supervision of the lottery pursuant to subsection (7) of this section, or games which are incidental to a bona fide social relationship, which are participated in by natural persons only and from which no person is gaining any profit but the gain from the direct realization of winnings.

(b) "Persons" means any natural person, domestic or foreign corporation, partnership, or stockholder who owns ten percent or more of the stock of a corporation.

10(a) Twelve percent of the gross proceeds as defined by the general assembly from casino gaming operations licensed pursuant to subsection (6) of this section shall be paid to the commission for the privilege of conducting casino gaming. Unless otherwise provided by statute, the commission shall distribute four percent of the gross proceeds collected pursuant to this subsection (10) to the state for distribution to the counties which have authorized casino gaming in proportion to the revenues generated by casino gaming operations within each jurisdiction. The said proceeds which a county is entitled to shall be distributed by the state within each county to any town, city, or the unincorporated portions of any county on a per capita basis. Local governments shall use the revenues received under this section (10) only for the purpose of property tax relief. Two percent of the proceeds collected pursuant to this subsection (10) shall be remitted to the General Fund to be utilized for the purpose of Public Education, two percent shall be remitted to the General Fund for the purpose of Social Services, two percent shall be remitted to the General Fund for the purpose of State Highways, and two percent shall be remitted to the General Fund for the purpose of development of water resources. The state may deduct a reasonable fee from such proceeds to cover the cost of collection and distribution of said revenues as the general assembly may provide.

(b) In addition to the twelve percent fee levied pursuant to paragraph (a) of the subsection (10), the commission may assess a reasonable fee on casino operations to cover the costs of the administration and enforcement of the provisions of section 2 of subsection 6.

(c) The general assembly shall enact, amend, or repeal such laws as are necessary to implement the provisions of section 2 subsection 8–10, to be effective no later than January 1, 1984.

(d) If any provision of this article, or its application in any particular case, is held invalid, the remainder of the article and its application in all other cases shall remain unimpaired.