In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE APPROVED SEPTEMBER 4, 1991, with Regard to the Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs, Fairplay and in Airports.

Kathy Verlo, Petitioner,

and

George L. James, Raymond Dellacroce, and Charles Sarner, Respondents,

and

Gale Norton, Bill Hobbs and Natalie Meyer, Title Setting Board.

No. 91SA359.

Supreme Court of Colorado,
En Banc.

Jan. 27, 1992.

---

Alpern, Johnson, Meyers, Stuart & Finlayson, P.C., Dan D. Stuart, Colorado Springs, for petitioner.

James C. Wilson, Jr., Denver, for respondents.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Denver, for title setting Bd.

Justice QUINN delivered the Opinion of the Court.

In this statutory proceeding filed pursuant to section 1–40–102(3)(a), 1B C.R.S. (1991 Supp.), the petitioner, Kathy Verlo, a registered elector of the State of Colorado, challenges the title, as well as the ballot title and submission clause, prepared by the Title Setting Review Board (Board) for a proposed constitutional amendment concerning limited gaming in Manitou Springs, Fairplay, and public airports. Verlo asserts that neither the title nor the ballot title and submission clause clearly expresses the true meaning and intent of the proposed constitutional amendment. We affirm the action of the Board.

## I.

The proposed constitutional amendment, which would amend section (9)(4)(b) and (5)(a) of article XVIII of the Colorado Constitution, and would add a new section (10) to article XVIII, was submitted to the Board so that the Board could fix a title, a ballot title and submission clause, and a summary of the measure before submitting it to the voters for approval or rejection. The proposed amendment, which is set

forth in its entirety in an appendix to this opinion, contains detailed provisions designed to legalize limited gaming in the cities of Manitou Springs and Fairplay, to allow airport authorities to place slot machines in public airports, to reduce the allowable tax on the proceeds of limited gaming, to limit state license fees or taxes on any limited gaming device, to allocate the tax and fee revenues to various governmental funds or entities, and to add the games of keno, roulette, and craps to those presently allowed in communities where limited gaming is permitted.

On September 4, 1991, the Board fixed the following title for the proposed measure:

AN AMENDMENT TO ARTICLE XVIII OF THE COLORADO CONSTITUTION TO LEGALIZE LIMITED GAMING IN THE CITIES OF MANITOU SPRINGS AND FAIRPLAY AND TO ALLOW AIRPORT AUTHORITIES TO PLACE SLOT MACHINES IN PUBLIC AIRPORTS, TO REDUCE THE ALLOWABLE TAX ON THE PROCEEDS OF LIMITED GAMING FROM 40% to 10%, TO LIMIT STATE LICENSE FEES OR TAXES ON ANY LIMITED GAMING DEVICE TO $25 ANNUALLY, TO ALLOCATE TAX AND FEE REVENUES, AND TO ADD KENO, ROULETTE AND CRAPS TO THE TYPES OF GAMES WHICH MAY BE CONDUCTED IN COMMUNITIES WHERE LIMITED GAMING IS PERMITTED.

The ballot title and submission clause, as determined by the Board, was as follows:

SHALL THERE BE AN AMENDMENT TO ARTICLE XVIII OF THE COLORADO CONSTITUTION TO LEGALIZE LIMITED GAMING IN THE CITIES OF MANITOU SPRINGS AND FAIRPLAY AND TO ALLOW AIRPORT AUTHORITIES TO PLACE SLOT MACHINES IN PUBLIC AIRPORTS, TO REDUCE THE ALLOWABLE TAX ON THE PROCEEDS OF LIMITED GAMING FROM 40% to 10%, TO LIMIT STATE LICENSE FEES OR TAXES ON ANY LIMITED GAMING DEVICE TO $25 ANNUALLY, TO ALLOCATE TAX AND FEE REVENUES, AND TO ADD

KENO, ROULETTE, AND CRAPS TO THE TYPES OF GAMES WHICH MAY BE CONDUCTED IN COMMUNITIES WHERE LIMITED GAMING IS PERMITTED?

The Board also prepared the following summary for the proposed amendment:

This measure provides that limited gaming shall be lawful in certain districts in the cities of Manitou Springs and Fairplay. The measure allows airport authorities to place slot machines in public airports. All gaming under this measure is subject to regulations by the Colorado limited gaming control commission. The measure adds keno, roulette, and craps to the limited gaming activities which may be conducted in communities where limited gaming is permitted, reduces the maximum tax on the proceeds of limited gaming to 10%, and limits to $25 the amount of any state tax or fee imposed on any limited gaming device or table. The measure also specifies how the resulting tax revenues shall be spent, setting aside percentages for the state, public school districts, mined land reclamation, the cities of Manitou Springs and Fairplay, municipal business improvement in the cities of Manitou Springs and Fairplay, the counties of El Paso and Park, and other purposes, and sets forth limits on the hours, methods, and conditions under which the limited gaming control commission may permit limited gaming and slot machine operations to be conducted.

Limited gaming in Manitou Springs and Fairplay, additional types of games, and the placement of slot machines in public airports are expected to increase revenues to state and local governments. However, placing new limits on taxes and fees applicable to existing gaming is expected to reduce revenues to state and local governments. Furthermore, state and local governments are expected to incur increased costs of administration, law enforcement, roads, and infrastructure as a result of this measure. The amounts of these revenues and costs are indeterminate.

After the Board fixed the title, ballot title and submission clause, and summary, Verlo filed a motion for a rehearing with the Secretary of State in which Verlo challenged the accuracy and fairness of the title and the ballot title and submission clause. Verlo asserted that the title and the ballot title and submission clause are misleading because they merely state that the proposed constitutional amendment will "legalize limited gaming in the cities of Manitou Springs and Fairplay," thereby suggesting that the citizens of those cities will have a choice as to whether they will permit limited gaming, when in fact the intent of the proposed constitutional amendment is to mandate that these cities enact ordinances necessary to implement the proposed constitutional amendment. Following a rehearing on Verlo's motion, the Board refused to substitute the word "mandate" or "require" in the title and in the ballot title and submission clause because, in the Board's opinion, such a change might mislead the public into thinking that the cities would be required to set up gaming establishments rather than enacting ordinances permitting private entities to engage in limited gaming operations. The Board, however, added the following sentence at the end of the first paragraph of the summary: "The measure provides that the cities of Manitou Springs and Fairplay are required to enact certain ordinances to implement limited gaming." Verlo thereafter filed a petition for review in this court, again claiming that the word "legalize" in the title and in the ballot title and submission clause does not represent the true intent and meaning of the proposed measure. Before addressing the merits of Verlo's claim, we briefly summarize the operative principles for resolving the propriety of the Board's action.

## II.

The statutory scheme for an initiated constitutional amendment requires the Board, which consists of the Secretary of State, the Attorney General, and the Director of the Office of Legislative Legal Services or the director's designee, to fix a title, a ballot title and submission clause, and a summary for any proposed constitutional amendment. § 1–40–101(2), 1B C.R.S. (1991 Supp.). The "title" is defined as "a brief statement that fairly and accurately represents the true intent and meaning of the proposed text of the initiative." § 1–40–100.3(6), 1B C.R.S. (1991 Supp.). The "submission clause" refers to "the language which is attached to the title to form a question which can be answered by 'yes' or 'no.'" § 1–40–100.3(4), 1B C.R.S. (1991 Supp.). The "ballot title" is "the language which is printed on the ballot which is comprised of the submission clause and the title." § 1–40–100.3(1), 1B C.R.S. (1991 Supp.). The "summary" consists of "a condensed statement as to the intent of the proposed law or constitutional amendment." § 1–40–100.3(5), 1B C.R.S. (1991 Supp.).

In setting a title, the Board is required to consider "the public confusion that might be caused by misleading titles" and must, wherever practicable, "avoid titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear." § 1–40–101(2), 1B C.R.S. (1991 Supp.). The ballot title, consisting of the title and the submission clause, must be "brief" and should "unambiguously state the principle of the provision sought to be added, amended, or repealed." *Id.* The summary likewise must be clear, concise, true, and impartial, and must not consist of argument, nor be such as to likely create prejudice, either for or against the measure. *Id.*

Because the statutory scheme requires concision, the Board need not and cannot describe every feature of a proposed measure in the title or in the ballot title and submission clause. *E.g., In the Matter of Proposed Constitutional Amendment Under the Designation "Pregnancy"*, 757 P.2d 132, 136 (Colo. 1988); *In re Proposed Initiative Concerning State Personnel System*, 691 P.2d 1121, 1124 (Colo.1984). Furthermore, the summary, which must be a "condensed" and impartial statement about the proposed measure, is not designed to fully educate the people on all aspects of the proposed

law. *In the Matter of Increase of Taxes on Tobacco Products,* 756 P.2d 995, 998 (Colo.1988). In light of the Board's statutory charge, the Board must be vested with considerable discretion in determining "whether it can fairly delineate or describe the ... constitutional provision ... without unduly expanding the title, ballot title and submission clause, and summary, and without jeopardizing the impartiality of the designations that ultimately will be placed before the electorate." *In the Matter of Proposed Constitutional Amendment Under the Designation "Pregnancy",* 757 P.2d at 137.

■ In reviewing the Board's action, we must not in any way concern ourselves with the merit or lack of merit of the proposed amendment, since that issue rests with the electorate. *Bauch v. Anderson,* 178 Colo. 308, 310, 497 P.2d 698, 699 (1972). We have emphasized in our prior decisions that all legitimate presumptions must be indulged in favor of the Board's action, and only in a clear case should its action be set aside as invalid. *Id.; see also In the Matter of Increase of Taxes on Tobacco Products,* 756 P.2d at 998; *In the Matter of Title, Ballot Title and Submission Clause, and Summary Pertaining to Casino Gaming Initiative,* 649 P.2d 303, 306 (Colo.1982). In short, so long as the title, the ballot title and submission clause, and the summary accurately reflect the central features of the initiated measure in a clear and concise manner, we will not interfere with the Board's choice of language.

### III.

■ Turning to Verlo's claim, we are satisfied that the Board's use of the term "legalize" in the title and in the ballot title and submission clause correctly and fairly expresses the true intent and meaning of the proposed constitutional amendment. The word "legalize" means "to make legal" or "to give legal validity or sanction to." *Webster's Third New International Dictionary* 1290 (1986); *see also Black's Law Dictionary* (6th ed. 1990) (legalize means "[t]o make legal or lawful" or "[t]o confirm or validate what was before void or unlaw-

ful"). In the context of the phrase "to legalize limited gaming in the cities of Manitou Springs and Fairplay," the word "legalize" expresses the sense that these cities will be required to legislate so as to make limited gaming legal within their respective municipalities.

Contrary to Verlo's argument, we do not construe the word "legalize" as somehow suggesting that the cities of Manitou Springs and Fairplay will retain the discretion either to legalize or to prohibit limited gaming as they see fit. The Board's decision to add a sentence to the summary stating that under the proposed constitutional amendment the cities of Manitou Springs and Fairplay would be "required to enact certain ordinances to implement limited gaming" merely expands upon what is conveyed in the title and in the ballot title and submission clause by the phrase "to legalize limited gaming in the cities of Manitou Springs and Fairplay." Nothing in the record persuades us that the Board's choice of language in the title and in the ballot title and submission clause is in any way misrepresentative of the true intent and meaning of the proposed constitutional amendment.

We accordingly affirm the ruling of the Board.

### APPENDIX

*Be it enacted by the People of the State of Colorado:*

SECTION 9(4)(b) and (5)(a) of Article XVIII of the Constitution of the State of Colorado are amended to read:

SECTION 9. *Limited Gaming Permitted.* (4)(b) "Limited gaming" means the use of slot machines and the card games of blackjack and poker, AND, EFFECTIVE MAY 1, 1993, KENO, ROULETTE, AND CRAPS, each game having a maximum single bet of five dollars.

(5)(a) EFFECTIVE MAY 1, 1993, up to a maximum of ~~forty~~ TEN percent of the adjusted gross proceeds of limited gaming shall be paid by each licensee, in addition to any applicable license fees, for the privilege of conducting limited gaming. Such

percentage shall be established annually by the commission according to the criteria established by the general assembly in the implementing legislation to be enacted pursuant to paragraph (c) of this subsection (5). Such payments shall be made into a limited gaming fund that is hereby created in the state treasury. NO STATE TAX OR LICENSE FEE ON ANY LIMITED GAMING DEVICE OR TABLE SHALL EXCEED TWENTY–FIVE DOLLARS ON OR AFTER MAY 1, 1993, FOR ANY CALENDAR YEAR.

Article XVIII is amended BY THE ADDITION OF A NEW SECTION to read:

SECTION 10. *Slot machines in public airports and additional limited gaming permitted.* (1) Any provision of section 2 or 9 of this article XVIII or any other provision of this constitution to the contrary notwithstanding, slot machines in all public airports and limited gaming in the city of Manitou Springs and in the city of Fairplay shall be lawful as of May 1, 1993.

(2) The definitions in section 9(4) of this article as well as the definitions in this subsection (2) apply to this section.

(a) "Public airport" means any area of land which is owned by a city, a county, an airport authority, or any other political subdivision of the state and is used or intended for use for the landing and takeoff of commercial passenger aircraft, and any appurtenant areas which are used or intended for use for airport buildings and facilities located thereon, including also land and buildings and all appurtenances necessary or convenient thereto for the accommodation or convenience of the public, whether or not directly or indirectly engaged in air transportation, including, but not limited to, parking, dining, recreational, and hotel facilities.

(3) The administration and regulation of this section 10 shall be under the limited gaming commission created pursuant to section 9 of this article, and said commission shall promulgate such rules as are necessary to implement this section and section 9 of this article, as amended, no

later than May 1, 1993, in the same manner and extent provided therein.

(4)(a) The general assembly shall enact such laws as are necessary to implement this section and section 9 of this article, to take effect on or before March 1, 1993.

(b) The city of Manitou Springs and the city of Fairplay, each, shall enact such ordinances as are necessary to implement this section, to take effect no later than March 1, 1993.

(c) Each city, county, airport authority, or other political subdivision of this state which owns a public airport and which authorizes slot machines to be placed therein may take appropriate legislative and administrative action to implement this section, to become effective on or after March 1, 1993.

(5) Each such city, county, airport authority, or other political subdivision of the state which owns a public airport is authorized to place or have placed slot machines in its public airport subject to the following limitations and requirements:

(a) Each slot machine shall have a maximum single bet of five dollars. No one under the age of twenty-one years shall be allowed to gamble or remain in the limited gaming areas.

(b) Slot machines shall be authorized to be operated twenty-four hours per day, seven days per week.

(c) No state tax or license fee on any limited gaming device or table shall exceed twenty-five dollars on or after May 1, 1993, for any calendar year.

(d) The adjusted gross proceeds from slot machines in any public airport shall be distributed as follows:

(I) Five percent to the limited gaming fund, created pursuant to section 9 of this article, for administrative and operational costs;

(II) Twenty-five percent to the city, county, airport authority, or other political subdivision of the state which authorizes slot machines, for administrative and operational costs, and for other services authorized by it.

(III) Seventy percent to such school fund as shall be designated by law for the support of education and reduction of property taxes in each public school district of the state.

(d) It is the intent of this subsection (5) that the proceeds distributed pursuant to paragraph (c)(III) of this subsection (5) shall be accumulated until each public school district's property tax mill levy can be reduced by one mill when distribution is made pursuant to a school finance law. Thereafter, distributions shall be for increased educational program funding, as determined by law. No such distribution shall operate to otherwise reduce state funding for public school districts.

(6) Limited gaming in the city of Manitou Springs and in the city of Fairplay shall be subject to the following:

(a) Limited gaming shall take place only within the city limits of the city of Manitou Springs, county of El Paso, and in the city of Fairplay, county of Park. Such limited gaming shall be further confined to the commercial areas and the downtown area land use districts as defined in the city of Manitou Springs zoning ordinance, as amended, dated September 25, 1975, and in the business and restricted business zones, as defined in the city of Fairplay zoning resolution, dated November 3, 1986. Either such city may, by ordinance, enlarge or annex property to such districts or zones, respectively, to be included in its gaming district.

(b) New construction and renovation within the Manitou Springs Historic District shall meet local design guidelines of the city of Manitou Springs. New construction and renovation outside such Historic District must blend in with existing buildings as determined by the local planning process. New construction and renovation within the city of Fairplay business and restricted business zones shall meet local design guidelines of the city of Fairplay.

(c) No limited gaming will be allowed within five hundred feet of any public elementary or secondary school under the distance measurements determinations and requirements as are prescribed by law for granting a license to sell alcoholic beverages.

(d) Each limited gaming device or table shall have a maximum single bet of five dollars.

(e) No one under the age of twenty-one years shall be allowed to gamble or remain in limited gaming areas.

(f) Limited gaming shall be prohibited between the hours of 2:00 o'clock a.m. and 8:00 o'clock a.m.

(g) Limited gaming licenses, or permits, shall be divided into two classes, Class A and Class B, defined as follows:

(I) Class A (Casino Operation):

(A) Primary gaming operation must be located in a single building and in a minimum space of 2,000 square feet (no maximum), and on one street level floor space.

(B) Any secondary gaming areas may be located in the same building as the primary operation but on any upper level or levels with no square footage requirements.

(C) Primary limited gaming operation shall have a minimum of forty operable limited gaming devices and tables, with no maximum limit. Total limited gaming operations shall include at least four of the six types of limited gaming devices and tables allowable.

(II) Class B (Other):

(A) Limited gaming operation must be secondary to the principal commercial operation or activity on the premises.

(B) Limited gaming operation shall be on the main entrance level and be located in an area not visible from a public street or right of way.

(C) Limited gaming operation shall not occupy more than twenty-five percent of the total public sales area and shall be identified as a separate gaming area.

(D) Limited gaming devices are limited to a minimum of five and maximum of fifteen slot machines. No table games are allowed.

(E) Slot machines shall not include any with Progressive Jackpots or Jackpots that must be reported to the Internal Revenue Service.

(h) Limited gaming may occur in establishments licensed to sell alcoholic beverages.

(i) License fees and tax rates:

(I) The city of Manitou Springs and the city of Fairplay shall each establish a Limited Gaming Fund. Except as otherwise provided in this section, all gaming revenues, taxes, and fees, received by each city shall be deposited in its Limited Gaming Fund.

(II) The city of Manitou Springs and the city of Fairplay each shall be authorized to impose annual city license fees.

(A) An annual city license may be required for Class A operations, not to exceed one hundred dollars.

(B) An annual city license may be required for Class B operations, not to exceed fifty dollars.

(C) An annual city license may be required for each gaming device or table, not to exceed one hundred dollars per device or table.

(D) All city imposed fees shall be paid, in advance, directly to the city of Manitou Springs or the city of Fairplay.

(E) No other city permit, license or tax stamps shall be required for a limited gaming operation in the city of Manitou Springs or the city of Fairplay, nor shall any additional city sales tax or amusement tax be assessed on limited gaming operations or limited gaming devices or tables.

(F) No county licenses shall be required nor county fees imposed on limited gaming operations in the city of Manitou Springs or the city of Fairplay.

(G) No state tax or license fee on any limited gaming device or table shall exceed twenty-five dollars on or after May 1, 1993, for any calendar year.

(j) Distribution of Funds—Limited Gaming in the city of Manitou Springs and the city of Fairplay.

(I) A tax of not more than ten percent of the adjusted gross proceeds of limited gaming operations shall be paid by each licensee to the Limited Gaming Fund established pursuant to section 9 of this article.

(II) The state treasurer shall distribute the tax funds monthly according to the following:

(A) Forty-five percent shall be transferred to the state general fund, from which all administrative and all related expenses shall be paid.

(B) Five percent shall be deposited to the credit of such fund or funds as shall be designated or created by law for the purpose of reclaiming abandoned rock quarries, closing to the public abandoned underground mines, and alleviating nonpoint source pollution of the waters of this state.

(C) Twenty percent shall be distributed in proportion to the limited gaming revenues generated in each respective city to the treasurer of the city of Manitou Springs and the city of Fairplay. Funds so distributed shall first be used to supplement or supplant revenues that might otherwise be collected as ad valorem taxation to balance each city's annual general fund budget. The use of limited gaming revenues in excess of the amount necessary to provide for a zero mill levy shall be unrestricted.

(D) Five percent shall be distributed to the treasurer of the Manitou Springs Metropolitan District and the Fairplay Front and Main Street Business Improvement District and appropriated in the same manner described for city revenues. If the District is disbanded or dissolved, then the funds so designated shall be distributed to the city of Manitou Springs and the city of Fairplay as specified in the above subparagraph (C).

(E) Five percent shall be distributed in proportion to the limited gaming revenues generated in each city to the General Fund of El Paso County and the General Fund of Park County, respectively.

(F) Five percent shall be distributed in proportion to the limited gaming revenues generated to School District 14 in Manitou

Springs and School District RE–2 in Park County, or their successor districts, if any, respectively, to supplement or supplant revenues that might otherwise be collected as ad valorem taxation to retire bonded indebtedness. Funds in excess of this amount shall be used for capital improvements and a scholarship program.

(G) Fifteen percent shall be distributed in proportion to the limited gaming revenues to two non-profit corporations, the membership in which shall be limited respectively to Manitou Springs and Fairplay limited gaming retail license holders. Upon incorporation under the laws of the state of Colorado, the members shall adopt by-laws, elect a board of directors which shall serve without pay, and be responsible for the administration and expenditure of the funds for area advertising, promotion, and community development capital expenditures. If either such corporation is not formed by May 1, 1994, then such distribution shall be made to the general fund of the city in which the corporation was not formed. Each such corporation shall cause an annual independent audit to be performed, and a copy of the audit report shall be filed with the clerk of that city.

(7) The general assembly shall enact provisions for the special licensing of qualifying nonprofit charitable organizations desiring to periodically host charitable gaming activities in licensed gaming establishments under subsection (G) of this section, in the same manner as provided for in section 9 of this article.

(8) It is hereby recognized and declared that significant differences are expressed between certain provisions of this section 10 and those in section 9 of this article; however, the unique historical characteristics and development of the cities named in the two sections give cause for such differences, both as to limited gaming requirements and limitations and the distribution of revenues.