In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY PERTAINING TO THE "LOTTERY FUNDS" INITIATIVE ADOPTED ON MAY 20, 1992 AND PETITION FOR REHEARING DENIED ON JUNE 5, 1992.

Anthony VAN WESTRUM, Petitioner,

v.

Stephen L. SMITH and Shirley A. Smith, as proponents of the proposed "Lottery Funds" Initiative, Respondents,

and

Natalie Meyer, Douglas G. Brown and Gale Norton, as members of the Title–Setting Board, Title Setting Board.

No. 92SA243.

Supreme Court of Colorado, En Banc.

July 20, 1992.

Burns, Wall, Smith and Mueller, P.C., Richard W. Dailey, Denver, for petitioner.

Stephen L. Smith, Denver, for respondents.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Denver, for Title Setting Bd.

Justice ERICKSON delivered the Opinion of the Court.

Anthony van Westrum, registered elector (petitioner), pursuant to section 1–40–102(3)(a), 1B C.R.S. (1991 Supp.), seeks review of the validity of the title, submission clause,[1] and summary set by the Initiative Title Setting Board (Board)[2] for a proposed statutory amendment to modify the distribution of proceeds from the state-supervised lottery. The petitioner asserted that the title, submission clause, and summary set by the Board do not reflect the true intent and meaning of the proposed Initiative and, therefore, sought a rehearing. The Board denied the petitioner's motion for a rehearing and retained the language originally set by the Board. We affirm.

I

The Board conducted the public meeting required by section 1–40–101(2) and set the title, submission clause, and summary for an initiated statutory amendment (Initiative) to section 24–35–210, 10A C.R.S. (1988 & 1991 Supp.). The Initiative would amend section 24–35–210 of the Colorado Revised Statutes to provide revenues from the state-supervised lottery as an alternative source of revenue for school financing. Beginning in fiscal year 1992–93, the Initiative proposes a reduction in the amount of lottery proceeds that are currently distributed from the lottery fund to the Conservation Trust Fund and to the Division of Parks and Outdoor Recreation. The Initiative also proposes a reduction in the amount of lottery proceeds that may be appropriated for state capital construction. in fiscal year 1998–99 and places a limit on the amount of lease-purchase obligations that may be made after January 15, 1993. Beginning in fiscal year 1992–93, the Initiative proposes that all lottery proceeds not otherwise transferred or distributed be appropriated for financing public schools as an offset to property taxes levied for that purpose. The text of the Initiative is included as an appendix to this opinion. The petitioner contested the validity of the title, submission clause, and summary fixed by the Board and filed a motion for rehearing under section 1–40–102(3)(a), 1B C.R.S. (1991 Supp.).[3] On June 5, 1992, the Board

---

1. The Title Board referred to the ballot title and submission clause as a single unit. This opinion will refer to the ballot title and submission clause as the "submission clause."

2. The Board consists of the secretary of state, the attorney general, and the director of the office of legislative legal services or the director's designee. See § 1–40–101(2), 1B C.R.S. (1991 Supp.).

3. Section 1–40–102(3)(a) provides:

 Any registered elector ... who is not satisfied with the titles, summary, and submission clause thus provided and claims them to be unfair or that they do not clearly express the true meaning and intent of the proposed law or constitutional amendment ... may file a motion with the secretary of state for a rehearing.... If overruled, a certified copy of

denied the petitioner's motion for rehearing and voted to retain the language of the title, submission clause, and summary set by the Board. Pursuant to section 1–40–102(3)(a), review is sought in this court.

## II

The question is whether the language set by the Board for the title, submission clause, and summary fairly and correctly expresses the true intent and meaning of the Initiative and adequately informs signers of petitions and voters of its effects. We answer in the affirmative.

The title, submission clause, and summary at issue provide:

### Title

AN ACT TO MODIFY THE DISTRIBUTION OF LOTTERY PROCEEDS TO LIMIT THE AMOUNT OF LOTTERY PROCEEDS DISTRIBUTED FOR LOCAL AND STATE PARKS AND RECREATION AREAS; TO LIMIT STATE CAPITAL CONSTRUCTION PROJECTS AND THE TOTAL AMOUNT OF OBLIGATIONS WHICH MAY BE MADE IN FUTURE YEARS FOR CAPITAL CONSTRUCTION; AND TO PROVIDE THAT ALL REMAINING LOTTERY PROCEEDS BE APPROPRIATED FOR FINANCING PUBLIC SCHOOLS TO OFFSET LOCAL PROPERTY TAXES LEVIED FOR SUCH PURPOSE.

### Submission Clause

SHALL THERE BE AN ACT TO MODIFY THE DISTRIBUTION OF LOTTERY PROCEEDS TO LIMIT THE AMOUNT OF LOTTERY PROCEEDS DISTRIBUTED FOR LOCAL AND STATE PARKS AND RECREATION AREAS; TO LIMIT STATE CAPITAL CONSTRUCTION PROJECTS AND THE TOTAL AMOUNT OF OBLIGATIONS WHICH MAY BE MADE IN FUTURE YEARS FOR CAPITAL CONSTRUCTION; AND TO PROVIDE THAT ALL REMAINING LOTTERY PROCEEDS BE APPROPRIATED FOR FINANCING PUBLIC SCHOOLS TO OFFSET LOCAL PROPERTY TAXES LEVIED FOR SUCH PURPOSE?

### Summary

This measure amends existing law to provide revenues from the state-supervised lottery as an alternative source of revenue for school financing. The amount of lottery proceeds which are currently distributed from the Lottery Fund to the Conservation Trust Fund and to the Division of Parks and Outdoor Recreation in the Department of Natural Resources is modified by reducing the total amount of lottery proceeds which may be so transferred or appropriated in fiscal year 1992–93 and thereafter.

This measure modifies the amount of lottery proceeds which are currently appropriated from the Lottery Fund for state capital construction, the current recipient of approximately two thirds of all state lottery fund net revenues, by reducing the total amount of lottery proceeds which may be so appropriated in fiscal year 1998–99 or at an earlier date if existing lease-purchase obligations have been discharged. A limitation is established on the total amount of obligations which may be made after January 15, 1993, for capital construction.

This measure requires, commencing in fiscal year 1992–93, the appropriation of all lottery proceeds not otherwise transferred or appropriated for financing public schools as an offset to property taxes levied for said purpose.

This measure would limit the maximum amount of lottery proceeds distributed to the Conservation Trust Fund to $7.5 million for each fiscal year and to

said petition with the titles, summary, and submission clause of such proposed law or constitutional amendment, together with a certified copy of such motion for rehearing and of the ruling thereon, shall be furnished upon request by the secretary of state to the

elector filing such motion and ... if filed with the clerk of the Colorado supreme court within five days thereafter shall be docketed as a cause there pending....

§ 1–40–102(3)(a), 1B C.R.S. (1991 Supp.).

the Division of Parks and Outdoor Recreation in the Department of Natural Resources to $7.5 million each fiscal year. The annual amount of lottery proceeds for state capital construction would be reduced; for example, by approximately $24 million in fiscal year 1992–93 and $44 million in fiscal year 1993–94. The remaining lottery proceeds to be used for financing public schools would reduce property taxes for schools; for example, by approximately 2.1% in fiscal year 1992–93 and 3.9% in fiscal year 1993–94.

## III

The people's constitutional right to initiate legislation and constitutional amendments is granted by article V, section 1(2) of the Colorado Constitution. The statutory scheme for initiated legislation or a constitutional amendment requires the Board to designate and fix a title, submission clause, and a summary for initiative petitions before they are signed by electors. *See* § 1–40–101(1), (2), 1B C.R.S. (1991 Supp.). "The purpose of the title setting process is to ensure that both persons reviewing an initiative petition and the voters are fairly and succinctly advised of the import of the proposed law." *In re Proposed Initiative on Education Tax Refund*, 823 P.2d 1353, 1355 (Colo.1991) (hereinafter *Education Tax Refund Initiative*); *Dye v. Baker*, 143 Colo. 458, 460, 354 P.2d 498, 500 (1960).

▬ In performing its statutory duty, the Board is not required to describe every feature of a proposed measure. *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs, Fairplay and in Airports*, 826 P.2d 1241, 1244 (Colo.1992) (hereinafter *In re Limited Gaming in Manitou Springs*); *Education Tax Refund Initiative*, 823 P.2d at 1355; *In re Proposed Initiative Concerning "State Personnel System"*, 691 P.2d 1121, 1124 (Colo.1984) (hereinafter *"State Personnel System" Initiative*). Nevertheless, the Board must consider "the public confusion that might be caused by misleading titles." § 1–40–101(2), 1B C.R.S. (1991 Supp.). The

title must correctly and fairly express the true meaning of the proposed measure, and the submission clause set by the Board should be brief and should "unambiguously state the principle of the provision sought to be added, amended, or repealed." *Id.* Similarly, the designated summary should be impartial and not an argument likely to create prejudice, either for or against the measure. *Id.*

▬ In reviewing the Board's title setting process we: (1) should not address the merit of the proposed Initiative and should not interpret the meaning of proposed language or suggest how it will be applied if adopted by the electorate; (2) should resolve all legitimate presumptions in favor of the Board; and (3) will not interfere with the Board's choice of language if the language is not clearly misleading. *Education Tax Refund Initiative*, 823 P.2d at 1355; *In re Proposed Initiative on Parental Notification of Abortions for Minors*, 794 P.2d 238, 240 (Colo.1990). "Our duty is to ensure that the title, submission clause and summary fairly reflect the proposed Initiative...." *Education Tax Refund Initiative*, 823 P.2d at 1355. Petition signers and voters should not be misled into support "for or against a proposition by reason of the words employed." *Dye v. Baker*, 143 Colo. at 460, 354 P.2d at 500.

## IV

▬ The petitioner claims that the title, submission clause, and summary are misleading because they suggest that the purpose of the Initiative is to fund school financing. He argues that the true purpose of the Initiative is to grant property tax relief and that voters will be unable to discern whether school funding has increased, decreased or remained unchanged. The petitioner also contends that the language is misleading because no new funds will be made available for financing public schools. We find no merit in the petitioner's claims.

Nothing in the text of the Initiative suggests that its purpose is to increase or decrease revenues for school funding. The

title and the submission clause state that the statutory amendment would modify and limit the existing distribution of lottery proceeds and that the remaining funds would be appropriated for financing public schools to "offset local property taxes levied for such purpose." The summary provides that the amendment would provide revenues from the state-supervised lottery as an alternative source of revenue for school financing. The language set by the Board all but duplicates the language contained in the text of the Initiative. In setting the title, submission clause, and summary, the Board properly discharged its duty under the statute. *See* § 1-40-101(2), 1B C.R.S. (1991 Supp.).

▮ The petitioner also contends that the summary is materially incomplete because it fails to state that an immediate reduction in the flow of lottery funds will probably lead to the insolvency of the state fund and require either a tax increase or budget cut to pay the cost of capital construction. This contention, however, is based on an erroneous view of the function of the Board and of the title-setting process. The designated summary of a proposed initiative should be impartial and not an argument that may create prejudice for or against the measure. *Id.* It is not the function of the Board or this court to educate the voters on all aspects of the proposal, *In re Limited Gaming in Manitou Springs,* 826 P.2d at 1244–45, or to consider the practical effects of a proposed initiative. *In re Proposed Initiative on Surface Mining,* 797 P.2d 1275, 1281 (Colo. 1990). It is sufficient that the summary accurately reflects the purpose of the Initiative. *See* § 1–40–101(2); *Education Tax Refund Initiative,* 823 P.2d at 1355. Here, the title, submission clause, and summary correctly and fairly reflect the true meaning of the proposed Initiative.

Accordingly, we affirm the ruling of the Board.

## APPENDIX A

Be it enacted by the People of the State of Colorado:

24–35–210. Lottery Fund. (4)(a)(I) The general assembly hereby finds and declares that there exists a critical need for additional state facilities in general and for state correctional facilities in particular and that the state-supervised lottery is an appropriate source of revenues for financing the acquisition of such facilities. To that end, it is the intent of the general assembly to augment and redistribute such revenues to create an enhanced and stable revenue source for such acquisition. It is further the intent of the general assembly that such revenue source be committed for such purposes and that, to the maximum extent permitted by law, the provisions of this subsection (4) remain unalterable in all material respects during the term of any financing undertaken pursuant to such provisions.

(II) THE PEOPLE OF THE STATE OF COLORADO HEREBY FIND AND DECLARE THAT THERE EXISTS A CRITICAL NEED FOR AN ALTERNATIVE SOURCE OF REVENUES FOR SCHOOL FINANCING AND THAT THE STATE-SUPERVISED LOTTERY IS AN APPROPRIATE SOURCE OF REVENUES FOR SCHOOL FINANCING. TO THAT END, IT IS THE INTENT OF THE PEOPLE OF COLORADO TO AUGMENT AND REDISTRIBUTE SUCH REVENUES TO CREATE AN ALTERNATIVE STABLE REVENUE SOURCE FOR SUCH SCHOOL FINANCING. IT IS FURTHER THE INTENT OF THE PEOPLE OF COLORADO THAT SUCH REVENUE SOURCE BE COMMITTED FOR SUCH PURPOSES AND THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE PROVISIONS OF THIS SUBSECTION (4) REMAIN UNALTERABLE IN ALL MATERIAL RESPECTS AS REGARDS TO PROVIDING AN ALTERNATIVE SOURCE OF REVENUES FOR SCHOOL FINANCING.

(b)(I) For fiscal year, 1987–88, forty percent of the net lottery proceeds in the lottery fund as of June 30, 1988; for fiscal year 1988–89, forty percent of the net lottery proceeds in the lottery fund as of June 30, 1989; except that such amount shall not exceed twelve million one hundred sixty

thousand dollars; ~~and, for each fiscal year thereafter, forty percent of the net lottery proceeds for such fiscal year; except that such annual amount shall not exceed ten million nine hundred sixty thousand dollars~~ FOR FISCAL YEARS 1989–90, 1990–91 AND 1991–92, FORTY PERCENT OF THE NET LOTTERY PROCEEDS; EXCEPT THAT SUCH ANNUAL AMOUNT SHALL NOT EXCEED TEN MILLION NINE HUNDRED SIXTY THOUSAND DOLLARS; AND, FOR EACH FISCAL YEAR THEREAFTER, FORTY PERCENT OF THE NET LOTTERY PROCEEDS FOR SUCH FISCAL YEAR; EXCEPT THAT SUCH ANNUAL AMOUNT SHALL NOT EXCEED SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS; plus

(II) For fiscal year 1989–90, twelve and eight-tenths percent of the projected incremental balance for such fiscal year; for fiscal year 1990–91, sixteen percent of the projected incremental balance for such fiscal year; for fiscal year 1991–92, twenty percent of the projected incremental balance for such fiscal year; for fiscal year 1992–93~~, twenty-two percent of the projected incremental balance for such fiscal year; for fiscal year 1993–94, twenty-six percent of the projected incremental balance for such fiscal year; for fiscal year 1994–95, thirty percent of the projected incremental balance for such fiscal year~~; and~~,~~ for each fiscal year thereafter, ~~forty percent of the projected incremental balance in the lottery fund for such fiscal year~~ APPROPRIATION OF REVENUES UNDER THIS PARAGRAPH (4)(B)(II) SHALL TERMINATE; plus

(III) For ONLY fiscal yearS 1989–90 ~~and each fiscal year thereafter~~, 1990–91 and 1991–92, forty percent of the amount by which the net lottery proceeds for such fiscal year exceed the sum of the maximum projected incremental balance for that fiscal year and thirty-six million dollars; FOR FISCAL YEAR 1992–93 AND FOR EACH FISCAL YEAR THEREAFTER APPROPRIATION OF REVENUES UNDER THIS PARAGRAPH (4)(B)(III) SHALL TERMINATE.

(c)(I) For fiscal year 1988–89, ten percent of the net lottery proceeds in the lottery fund as of June 30, 1988; for fiscal year 1989–90, ten percent of the net lottery proceeds in the lottery fund as of June 30, 1989; except that such amount shall not exceed three million forty thousand dollars; and, for ~~1989–90 and for each fiscal year thereafter,~~ FISCAL YEARS 1990–91 AND 1991–92, ten percent of the net lottery proceeds for such fiscal year; except that such annual amount shall not exceed two million seven hundred forty thousand dollars; AND, FOR FISCAL YEAR 1992–93 AND FOR EACH FISCAL YEAR THEREAFTER, TEN PERCENT OF THE NET LOTTERY PROCEEDS FOR SUCH FISCAL YEAR; EXCEPT THAT SUCH ANNUAL AMOUNT SHALL NOT EXCEED SEVEN MILLION FIVE HUNDRED THOUSAND DOLLAR; plus

(II) For fiscal year 1989–90, three and two-tenths percent of the projected incremental balance for such fiscal year; for fiscal year 1990–91, four percent of the projected incremental balance for such fiscal year; for fiscal year 1991–92, five percent of the projected incremental balance for such fiscal year; for fiscal year 1992–93, ~~five and five-tenths percent of the projected incremental balance for such fiscal year; for fiscal year 1993–94, six and five-tenths of the projected incremental balance for such fiscal year; for fiscal year 1994–95, seven and five-tenths percent of the projected incremental balance for such fiscal year~~; and~~,~~ for each fiscal year thereafter~~, ten percent of the projected incremental balance for such fiscal year;~~ APPROPRIATION OF REVENUES UNDER THIS PARAGRAPH (4)(C)(II) SHALL TERMINATE; plus

(III) For only fiscal years 1989–90 ~~and for each fiscal year thereafter~~, 1990–91 AND 1991–92, ten percent of the amount by which the net lottery proceeds for such fiscal year exceed the sum of the maximum projected incremental balance for that year and thirty-six million dollars; AND, FOR FISCAL YEAR 1992–93 AND FOR EACH FISCAL YEAR THEREAFTER APPROPRIATION OF REVENUES UNDER

THIS PARAGRAPH (4)(C)(III) SHALL TERMINATE.

(d)(I) The general assembly shall annually appropriate ~~all net lottery proceeds not otherwise transferred or appropriated pursuant to the provisions of this subsection (4)~~ for capital construction for the state AN AMOUNT TO BE DETERMINED as follows:

(A) For fiscal year 1989–90, the amount not transferred or appropriated pursuant to (b)(I) and (c)(I) of this subsection (4); and for fiscal years 1990–91, ~~and each fiscal year thereafter~~ 1991–92, 1992–93, 1993–94, 1994–95, 1996–97 AND 1997–98, the amount not transferred or appropriated under said paragraphs (b)(I) and (c)(I) but not to exceed twenty-two million three hundred thousand dollars; AND, FOR FISCAL YEAR 1998–99 AND FOR EACH FISCAL YEAR THEREAFTER, OR UNLESS ANY EXISTING LEASE–PURCHASE OBLIGATIONS UNDERTAKEN BY THE STATE PURSUANT TO THIS SUBSECTION (4) ARE DISCHARGED AT ANY EARLIER DATE, IN WHICH CASE, THE CAPITAL CONSTRUCTION REVENUES FROM THIS SUBSECTION SHALL BE, ten percent of the net lottery proceeds for such fiscal year; except that such annual amount shall not exceed seven million five hundred thousand dollars; plus

(B) For fiscal yearS 1989–90 ~~and each fiscal year thereafter~~, 1990–91, 1991–92, 1992–93, 1993–94, 1994–95, 1995–96, 1996–97, AND 1997–1998, the amount of the projected incremental balance for such fiscal year not transferred or appropriated pursuant to paragraphs (b)(II) and (c)(II) of this subsection (4); AND FOR FISCAL YEAR 1992–93 AND EACH FISCAL YEAR THEREAFTER, OR UNLESS ANY EXISTING LEASE–PURCHASE OBJECTIONS UNDERTAKEN BY THE STATE PURSUANT TO THIS SUBSECTION (4) ARE DISCHARGED AT ANY EARLIER DATE, IN WHICH CASE, ALL REVENUES FOR CAPITAL CONSTRUCTION FROM THIS PARAGRAPH SHALL TERMINATE; plus

(C) For fiscal yearS 1989–90 ~~and each fiscal year thereafter~~, 1990–91, 1991–92, 1992–93, 1993–94, 1994–95, 1995–96 AND 1997–98, the amount not transferred or appropriated pursuant to paragraphs (b)(III) and (c)(III) of this subsection (4); AND, FOR FISCAL YEAR 1992–93 AND FOR EACH FISCAL YEAR THEREAFTER, OR UNLESS ANY EXISTING LEASE–PURCHASE OBLIGATIONS UNDERTAKEN BY THE STATE PURSUANT TO THIS SUBSECTION (4) ARE DISCHARGED AT ANY EARLIER DATE, IN WHICH CASE, ALL REVENUES FOR CAPITAL CONSTRUCTION FROM THIS PARAGRAPH SHALL TERMINATE.

(D) NO NEW CAPITAL CONSTRUCTION OBLIGATIONS SHALL BE MADE AFTER JANUARY 15, 1993, UNLESS, THE CUMULATIVE OBLIGATIONS ARE WITHIN THE FISCAL MONETARY LIMITATION SET AT SEVEN MILLION FIVE HUNDRED THOUSAND IN PARAGRAPH (4)(D)(I)(A), AND IN LIGHT OF EXISTING OBLIGATIONS APPROPRIATED REVENUES UNDER SAID PARAGRAPH.

(II) The net lottery proceeds APPROPRIATED UNDER THIS PARAGRAPH (D) may also be used to reimburse counties for their actual expenses incurred in housing inmates in the county facilities for the department of corrections. The director of the department of corrections is hereby authorized to contract with county commissioners for placement of corrections department inmates in county facilities when the director determines that such a contract would be in the best interests of the state.

(h) ~~This subsection (4) is repealed, effective September 1, 1998, or on any earlier date that any lease-purchase obligations undertaken by the state pursuant to this subsection (4) are discharged.~~ REPEALED, EFFECTIVE JANUARY 15, 1993.

(i) THE GENERAL ASSEMBLY SHALL ANNUALLY APPROPRIATE ALL NET LOTTERY PROCEEDS NOT OTHERWISE TRANSFERRED OR APPROPRIATED PURSUANT TO ANY OF THE PROVISIONS OF THIS SUBSECTION (4)

FOR PUBLIC SCHOOL FINANCING TO OFFSET PROPERTY TAXES UNDER THE PROVISIONS OF 22–53–114(2)(c) C.R.S., SUCH THAT, THE MILL LEVY FOR THE COLLECTION YEAR IS REDUCED TO ACCOUNT FOR THE PROJECTED OFFSET FROM THE LOTTERY FUND.

(4.1) ~~(a) At least fifteen days prior to the quarterly distribution of net lottery proceeds required by subsection (10) of this section, the commission shall notify the state treasurer of the amount of money to be transferred from the lottery fund to the conservation trust fund. The amount to be transferred shall be forty percent of the net proceeds of the lottery for the preceding fiscal quarter after payment of the expenses of the division and any prizes for the lottery and after reserving sufficient moneys, as of the end of the fiscal year, to ensure the operation for the ensuing fiscal year.~~

~~(b) (I) The general assembly shall annually appropriate ten percent of the net proceeds of the lottery to the division of parks and outdoor recreation in the department of natural resources to be used for the purposes provided in paragraph (d) of this subsection (4.1) and shall annually appropriate fifty percent of the net proceeds of the state lottery for capital construction for the state.~~

~~(II) The appropriation of moneys from the state lottery for capital construction shall be consistent with part 13 of article 3 of title 2, C.R.S., until such time as said part 13 is repealed.~~

~~(c) The lottery money available for appropriation to the division of parks and outdoor recreation pursuant to paragraph (b) of this subsection (4.1) shall be appropriated and expended for the acquisition and development of new state parks, new state recreation areas, or new recreational trails, for the expansion of existing state parks, state recreation areas, or recreational trails, or for capital improvements of both new and existing state parks, state recreation areas, or recreational trails. In addition to appropriation for the division's capi-~~ ~~tal construction budget, said lottery money may be appropriated for the division's operating budget for expenditures attributable to the maintenance and operation of state parks, state recreation areas, or recreational trails, or any portions thereof, that have been acquired or developed with lottery money.~~ REPEALED, EFFECTIVE JANUARY 15, 1993.

(10)(b)(II) ~~This paragraph (b) is repealed, effective September 1, 1998, or on any earlier date that any lease-purchase obligations undertaken by the state pursuant to subsection (4) of this section is discharged.~~ REPEALED, EFFECTIVE JANUARY 15, 1993.