**In the Matter of the Title, Ballot Title and Submission Clause, and Summary Adopted February 3, 1993, Pertaining to the PROPOSED ELECTION REFORM AMENDMENT.**

**George Dibble, Edythe Miller, and Susan E. Burch, Petitioners,**

and

**Douglas Bruce, Respondent,**

and

**Natalie Meyer, Ray Slaughter, and Rebecca Lennahan, Title Setting Board.**

**No. 93SA50.**

Supreme Court of Colorado, En Banc.

May 10, 1993.

James C. Wilson, Jr., Hays & Wilson, Mark Bender, Denver, for petitioners George Dibble and Edythe Miller.

Susan E. Burch, pro se.

Douglas Bruce, pro se.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Gen. Legal Services Section, Denver, for Title Setting Bd.

Justice MULLARKEY delivered the Opinion of the Court.

Three petitioners, George Dibble, Edythe Miller, and Susan E. Burch, bring two separate challenges to the title, ballot title and submission clause (the "titles"), and summary of a proposed initiated constitutional amendment set by the title setting board (the Board) pursuant to section 1–40–102(3), 1B C.R.S. (1992 Supp.). The proposed amendment, if approved by the voters, would add a new section 2 to Article VII of the state constitution, making numerous revisions to the electoral and political processes and institutions of the state. The text of the proposed initiative, the titles, and summary are appended to this opinion.

Petitioner Burch contends that: the titles of the proposed constitutional amendment fail to identify crucial elements of the proposed amendment; the titles fail to inform potential petition signers and voters that common words have unique meanings in the proposal; the titles use terms inaccurately, which would lead to voter confusion; and the titles mischaracterize changes made by the proposed amendment. Petitioners Dibble and Miller contend that: the title setting board is incompetent to interpret the constitution to determine on which ballot the proposed constitutional amendment would appear; the titles are infirm in that they do not contain the general subject matter of the proposed constitutional amendment; the titles do not specifically enumerate the changes in the number of state legislative districts; the summary lists the provisions of the proposed constitutional amendment chronologically rather than in order of significance; and the fiscal impact statement is not sufficiently specific. Respondent Douglas Bruce, in his answer brief, also asks this court to set the titles in a form he suggests in his brief. We affirm the ruling of the Board in part, reverse in part, and remand for further proceedings consistent with this opinion. Furthermore, as we held in *In re the Title, Ballot Title and Submission Clause, and Summary Pertaining to the Workers Comp Initiative*, 850 P.2d 144 (Colo.1993), we conclude that the question of whether the proposed amendment properly would appear on the ballot during the November 1993 election or the November 1994 election is premature at this time.

I.

Article V, section 1(2) of the Colorado Constitution reserves to the registered electors of the State of Colorado the constitutional right to initiate legislation and constitutional amendments. Section 1–40–101(1) and (2), 1B C.R.S. (1992 Supp.) authorizes the Board to designate and fix the titles and summary for an initiative petition before it is signed in furtherance of the right reserved in the constitution. The Board's statutory duty is to "consider the public confusion that might be caused by misleading titles" and to "avoid titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear." § 1–40–101(2). The titles drafted by the Board "shall correctly and fairly express the true intent and meaning" of the proposed initiative. *Id.* The Board is also charged with preparing a "clear, concise summary of the proposed law or constitutional amendment" which "shall be true and impartial and shall not be an argument, nor likely to cause prejudice, either for or against the measure." *Id.* Finally, if, in the opinion of the Board, the proposed law or constitutional amendments will have a fiscal impact on the state or any of its political subdivisions, the Board is to include in the summary an estimate of any such fiscal impact, together with an explanation thereof. *Id.*

In reviewing the Board's title setting process, this court does not address the merits of the proposed initiative and should not interpret the meaning of proposed language or suggest how it will be

applied if adopted by the electorate; we should resolve all legitimate presumptions in favor of the Board; and we will not interfere with the Board's choice of language if the language is not clearly misleading. Our duty is to ensure that the title, ballot title, submission clause, and summary fairly reflect the proposed initiative so that petition signers and voters will not be misled into support for or against a proposition by reason of the words employed by the Board. *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the Town of Burlington*, 830 P.2d 1023, 1026 (Colo. 1992).

A registered elector who is not satisfied with the action of the Board is authorized, pursuant to section 1–40–102(3), to file a motion for rehearing with the secretary of state on the basis that the titles and summary are "unfair" or "do not clearly express the true meaning and intent of the proposed law or constitutional amendment." If the Board denies the motion for rehearing, the elector is authorized to petition this court for review of the Board's action. *Id.*

Douglas Bruce has proposed a constitutional amendment which will roll back compensation adopted after 1988 for certain elected officials to 1988 levels; provide for tax credits on certain qualified campaign contributions, and regulate campaign contributions from certain entities to candidates and governmental officials; regulate and restrict the activities and affiliations of governmental entities, officials, and employees with regard to ballot issue elections; reduce the size of the state senate to 33 members, and increase the size of the state house of representatives to 66 members, with each senate district being comprised of two adjoining house districts; provide for congressional reapportionment to be done by the state redistricting committee; and substantially change the laws regarding initiative petitions. The changes to the laws regarding initiative petitions include changes regarding recall petitions (including subjecting judges to recall), providing for weekly ballot title setting and title setting by any district court, and appeal to this court within five days, and a decision from this court within ten days; providing that only eight measures per year may be adopted by any governmental entity as "emergencies" which are excepted from voter approval, and requiring a two-thirds vote of each house or of the local government board to declare a measure as an "emergency"; excepting certain types of petition errors from invalidating signatures or petitions; and repealing all changes in state petition law adopted subsequent to 1988 which were adopted without voter approval. The petitioners challenged the titles and summary set by the Board, and have brought this appeal after their motions for rehearing by the Board were denied.

## II.

■ As the above (not exhaustive) description of the manifold purposes of this 1696–word proposed constitutional amendment shows, the Board had, as Burch states in her brief, a herculean task, especially with the twin statutory tasks of making the ballot title "brief" and "correct and fair," and the summary "clear and concise."[1] For the most part, the Board succeeded in its task. However, if a choice must be made between brevity and a fair description of essential features of a proposal, the decision must be made in favor of full disclosure to the registered electors. In the case of a complex measure embracing many different topics like the proposal now before us, the titles and summary cannot be abbreviated by omitting references to the measure's salient features.

## A.

■ As a threshold matter, petitioners Dibble and Miller contest the Board's authority to interpret the constitution relative to the timing of the initiative process. We

---

**1.** Petitioner Burch included her summary of the proposed amendment in her brief, which filled almost seven pages.

considered a similar question in *In re the Title Pertaining to the Workers Comp Initiative*, 850 P.2d 144, raising the Board's jurisdiction to set titles for a non-tax or -revenue ballot issue during an odd-numbered year, and we concluded that the question was premature in that case. Because, as we understand the petitioners' argument, their challenge to the Board's authority goes to its authority to set titles at the present time, regardless of when the ballot issue is to be presented to the voters, the same reasoning applies here. The Board has no authority to place any measure on a ballot. That function is reserved solely to the secretary of state, who has not acted. This issue is premature.

### B.

■ Respondent Bruce complains that the titles set by the Board are too long, and asks this court, apparently for the first time, to shorten the titles. Section 1–40–101(3) provides that a person presenting a petition who is not satisfied with the titles and summary set by the Board may file a motion for rehearing with the secretary of state within forty-eight hours after the return of the titles and summary. The record on appeal includes no indication of any such motion for rehearing by respondent Bruce. Because no such motion was filed with the Board, we have no jurisdiction, pursuant to section 1–40–101(3), to entertain respondent Bruce's complaints regarding the titles and summary set by the Board.[2]

### III.

Next, we will scrutinize the claims of the petitioners. We will first examine the contentions of petitioner Burch, and then those of petitioners Dibble and Miller, in the order in which they present their arguments.

### A.

Petitioner Burch first argues that the titles of the proposed constitutional amend-

ment fail to identify crucial elements of the proposed amendment. Specifically, she claims that the titles should indicate: (1) that the proposal supersedes conflicting state constitutional, state statutory, charter, or other state or local provisions; (2) that the proposal establishes mandatory, nonsuspendable fines for willful violations of the campaign contribution and election protection provisions; (3) that the proposal requires the appropriate government to print petitions for petitioners; and (4) that there is an exception to the proposal's extension of petition power for appropriations.

■ We agree that the titles should include the proposal's establishment of mandatory, nonsuspendable fines for willful campaign contribution and election protection provision violations, but disagree with the other specifics. First of all, we have held previously that there is no requirement that the Board state the effect an initiative will have on other constitutional and statutory provisions. *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the Town of Burlington*, 830 P.2d at 1027–28. Furthermore, the Board is not required to and, in this case, clearly cannot describe every feature of a proposed measure in the titles. *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs*, 826 P.2d 1241, 1244 (Colo.1992). The Board is charged with the duty to act "with utmost dedication to the goal of producing documents which will enable the electorate, whether familiar or unfamiliar with the subject matter of a particular proposal, to determine intelligently whether to support or oppose such a proposal." *In re Proposed Initiative Concerning "State Personnel System"*, 691 P.2d 1121, 1123 (Colo. 1984). Although the titles correctly and fairly express the true intent and meaning of the proposed amendment regarding the

---

**2.** Similarly, respondent Bruce invites us to adopt his interpretation of article X, section 20 of the state constitution set forth in his answer brief. Because such considerations are far be-

yond the scope of our review of the titles and summary of an initiative petition, we cannot accept Respondent Bruce's invitation.

petitioner's other claims,[3] the imposition of mandatory, nonsuspendable fines for certain campaign violations must appear in the titles so that they "unambiguously state the principle of the provision sought to be added, amended, or repealed." § 1–40–101(2).[4]

### B.

■■■ Burch next contends that the titles fail to inform potential voters and petition signers that common words have unique meanings in the proposal. Again, as we noted above, the titles do not have to describe every feature of a proposed measure. Although the definitions may be broader than common usage in some respects and narrower in others, the measure's definitions appear to be included for sake of brevity. Regardless of the purpose of the inclusion of the definitions, they would not adopt a new or controversial legal standard which would be of significance to all concerned with the issues surrounding election reform. In this sense, therefore, the absence of the definitions is not at all like that in *In re Proposed Initiative on Parental Notification of Abortions for Minors*, 794 P.2d at 242 (rejecting titles and summary which did not state that proposed amendment adopted a legal definition of abortion as causing termination of a fetus at any time after fertilization, "a legal standard that is new and likely to be controversial").

The action of the Board is adequate in this respect.

3. However, the proposed amendment's provision requiring governments to print and deliver at the government's expense petitions in a quantity allowing at least twice the minimum number of required signers should be reflected in the statement of fiscal impact in the summary. *See infra* part IV.

4. In *In re Proposed Initiated Constitutional Amendment of Education*, 682 P.2d 480, 482–83 (Colo.1984) and *In re Proposed Initiative on Parental Notification of Abortions for Minors*, 794 P.2d 238, 242 & n. 5 (Colo.1990), we held that certain phrases must be added to the titles in order for the titles to fairly reflect the content of the proposed amendment.

### C.

■■■ Petitioner Burch's next argument is that the titles use terms inaccurately, leading to voter confusion. Specifically, she argues that the titles: (1) improperly state that the proposal limits contributions to candidates, elected officials, and campaign committees from specified sources, when in fact it also prohibits contributions in certain circumstances; and (2) state that the proposal extends petition powers to residents of all political jurisdictions, when "district" is defined to mean state and local governments, and not other political jurisdictions. We agree as to the first complaint, but disagree regarding the second.

Paragraph (4)(b) of the proposed measure would provide:

District candidates or elected officials or their campaign committees shall not accept any donation with a retail value over $50 per calendar year per donor, or any utility service discount, from any utility with rates or service regulated by that district, from any group receiving over 5% of its annual gross receipts from that district, or from a corporation, business group, employee group, political action committee other than a political party, or paid lobbyist who is not a relative.

The portion of the titles which refers to this paragraph states, "TO LIMIT CONTRIBUTIONS THAT POLITICAL CANDIDATES, ELECTED OFFICIALS, AND THEIR CAMPAIGN COMMITTEES MAY ACCEPT FROM SPECIFIED SOURCES." Because the proposal would flatly prohibit, and not merely limit, utility service discounts, the titles as formulated by the

On remand, to correctly and fairly reflect the contents of the proposed amendment, the titles should be amended to add the phrase, "TO REQUIRE A MANDATORY FINE FOR VIOLATION OF THE CAMPAIGN CONTRIBUTION AND PUBLIC EXPENDITURE PROVISIONS," between "TO RESTRICT THE USE OF PUBLIC RESOURCES IN CONNECTION WITH BALLOT ISSUE CAMPAIGNS" and "TO CHANGE MEMBERSHIP OF THE STATE HOUSE OF REPRESENTATIVES FROM 65 TO 66 AND THE STATE SENATE FROM 35 TO 33, AND REQUIRE THAT STATE SENATE DISTRICTS EACH CONSIST OF TWO STATE HOUSE DISTRICTS." *See infra* footnote 7. The summary should be amended accordingly, as well.

Board do not correctly and fairly express the true intent and meaning of the proposed measure. Instead, the fact that the proposed amendment would prohibit certain contributions must be reflected by the titles for them to express the true intent of the measure.[5]

With regard to Burch's other argument that terms are used misleadingly, the titles state, "TO EXTEND PETITION POWERS TO RESIDENTS OF ALL POLITICAL JURISDICTIONS." Burch complains that this is inaccurate because the titles allegedly imply that non-sovereign political jurisdictions will be subject to the petition power, and because certain local governments, such as business improvement districts, which do not have "residents," may be "districts" to which expanded petition powers apply.

In *Say v. Baker*, 137 Colo. 155, 160, 322 P.2d 317, 319 (1958) (quoting *Wieder v. Hoss*, 21 P.2d 780 (Or.1933)), we noted that our job is not to write the best possible ballot title but simply to eliminate a title which is insufficient or unfair. Although, in hindsight, we may be able to draft titles which would be clearer than those set by the Board, we conclude that the titles are sufficient with respect to the portion regarding the expansion of the petition power.

### D.

■ Petitioner Burch's final argument is that the titles mischaracterize changes made by the proposed amendment. Specifically, Burch contends that the titles do not sufficiently describe the effects of paragraph (7) of the proposed amendment, which deals with the petition process. While the titles do mention that the proposed amendment extends petition powers, subjects judges to recall, limits the number

of legislative enactments exempted from petitions, invalidates post–1988 state legislation governing petitions, and limits changes of voter-approved measures, the titles also state, "TO REVISE PROCEDURAL PROVISIONS GOVERNING THE INITIATIVE, REFERENDUM, AND RECALL." We agree with Burch's contention that this is insufficient.

The proposed amendment provides for certain procedural changes governing the initiative, such as providing that a petition will not be invalid because the wrong color ink is used. The proposal, however, does more than make procedural changes. Some of the proposed changes in the law are substantive, such as the provision that an incumbent unsuccessfully recalled would not be entitled to repayment of campaign expenses, or that an incumbent would be subject to recall only once during a single term of office. Similarly, the provisions of the proposal which would permit an elector who has moved within a county since last registering or who uses a post office box as an address would appear to effect substantive changes to voter registration law.

The titles, in order to correctly and fairly express the true intent and meaning of the proposed measure, must indicate that the revisions are to both substantive and procedural provisions governing the initiative, referendum, and recall.[6]

### E.

Turning to the petition brought by Dibble and Miller, we have already disposed of their first issue, the authority of the Board to determine on which ballot to place the measure, and we now look to whether the titles are insufficient because they do not contain the general subject matter of the proposed constitutional amendment, and

---

5. For this reason, on remand, to correctly and fairly reflect the contents of the proposed amendment, the titles should be amended by adding the phrase "or prohibit" to read, in relevant part: "TO LIMIT OR PROHIBIT CONTRIBUTIONS THAT POLITICAL CANDIDATES, ELECTED OFFICIALS, AND THEIR CAMPAIGN COMMITTEES MAY ACCEPT FROM SPECIFIED SOURCES."

6. For this reason, on remand, the Board should amend the titles by adding the phrase "and substantive" to read, in relevant part, "TO REVISE PROCEDURAL AND SUBSTANTIVE PROVISIONS GOVERNING THE INITIATIVE, REFERENDUM, AND RECALL."

they list the provisions of the proposed amendment chronologically rather than in order of significance. We conclude that the titles as set by the Board are sufficient in this respect.

█ The Board, in its brief, argues that it did not have the authority to rearrange the titles in order of the significance of the subject matter or to set a title containing a general subject matter heading, because such actions would go beyond ascertaining the intent of the initiative so as to interpret the meaning of the proposed language. *In re Proposed Initiative on Parental Notification of Abortions for Minors*, 794 P.2d at 240. Although we conclude that the Board acted within its discretion to set the title in the format as it did, it would not necessarily be improper for the Board to arrange the titles so as to reflect the subject matters at issue, or a general overview of the proposal. *See In re Title Pertaining to Sale of Table Wine in Grocery Stores*, 646 P.2d 916, 921 (Colo.1982) (not improper for Board to set titles explaining how initiative fits into context of existing law, which Board thought was of utmost importance). Such arrangement would not necessarily indicate that the Board was "interpreting" a measure, because the subject matters could be arranged in any order, or even randomly. However, because we are not here to set perfect titles, but merely to ensure that the Board sets sufficient titles, we see no need to disturb the Board's action in this respect.

### F.

█ Petitioners Dibble and Miller contend that the titles are insufficient in that they do not specifically enumerate the changes in the number of state legislative districts. We agree.

The changes in the number of house and senate districts is a matter of significance to all concerned with the issues dealt with in the proposed amendment. It would re-quire reapportionment upon passage, and, although one member of the house of representatives would be added, two senate seats would be eliminated. At least some voters would lose one or both of their present representatives to the General Assembly. In order that the titles "unambiguously state the principle of the provision sought to be added, amended, or repealed," § 1–40–101(2), we conclude that the titles must indicate that the amendment would change the membership of the state house of representatives from 65 to 66 and the state senate from 35 to 33.[7]

### IV.

█ Petitioners Dibble and Miller's final argument is that the statement of fiscal impact is inadequate. We agree.

The Board, pursuant to statute, requested the Office of State Planning and Budgeting (OSPB) and the Department of Local Affairs (DLA) to assist it in preparing the fiscal impact statement. The OSPB made a detailed estimate of the costs to the state in each paragraph of the proposed amendment. In paragraph (1), the OSPB determined that the jury trial and petition protest trials in paragraph (7) could increase trial costs in the judicial system, because jury trials cost $1,225 per day for the first three days of trial (the average length of a trial), and $1,925 per day thereafter. The provision that awards attorney fees to successful plaintiffs could require costs of more than $75,500 per case, plus court costs to state and local government defendants. Paragraph (3), regarding pay raises, would have no effect on the state, because state officials' salaries have not increased above inflation since 1988. Paragraph (4), providing for tax credits for campaign contributions, could result in state revenue losses of from between $6.7 million to $10 million, as well as $19,325 to revise the current tax return processing computer programs and data entry costs of

---

7. On remand, the Board should amend the titles as follows: "TO CHANGE THE MEMBERSHIP OF THE STATE HOUSE OF REPRESENTATIVES FROM 65 TO 66 AND THE STATE SENATE FROM 35 TO 33," in lieu of "TO CHANGE THE NUMBER OF STATE LEGISLATIVE DISTRICTS," and leaving intact "AND REQUIRE THAT STATE SENATE DISTRICTS EACH CONSIST OF TWO STATE HOUSE DISTRICTS."

from between $1,100 and $1,700. The provisions of paragraph (5) regarding governmental officials' participation in elections would have an indeterminate impact. Paragraph (6) would have an indeterminate impact, except that the reduction in the size of the legislature would result in salary and cost savings for that one position. Finally, paragraph (7) would result in cost increases of $9,200 for an estimated three additional Title Board meetings per year, $51,000 for printing and $3,000 for delivery costs for an estimated 30 ballot titles set, $16,000 for clerical support and $106,000 for Administrative Law Judges and hearing officers for an estimated 10 petition protests and public hearings, as well as $41,700 for representation by the Attorney General at the public hearings, and $6,800 for legal expenses in resolving an estimated eight ballot issues before this court, and the Judicial Department would expend in excess of $3,400 per ballot title and petition protest issue to this court.

The DLA's estimate of costs to local governments was much less detailed. The DLA, however, did mention that paragraph (3), which would provide for the rollback of pay increases since 1988, could have a negative fiscal impact if an official or employee violated the provision and became subject to adjudicatory costs or fines, which the jurisdiction might have to pay. It stated that this provision's possible positive impact was indeterminate because it was unclear to which officials the provision might apply and the DLA did not know which officials had received increases in compensation since 1988. The extension of petition powers to all "districts," which the DLA presumed would include counties and special districts, subjecting judges to recall, and the mandate that governments print and deliver petitions at their expense would have negative fiscal impacts. The provision that governments would not have to reimburse the campaigns of officials in unsuccessful recalls would have a positive impact. The DLA, however, did not estimate the magnitude of such fiscal impacts.

We have held numerous times that the Board is not required to include a definitive estimate of any fiscal impact on the state or its political subdivisions when that impact cannot be determined because of the variables involved. *In re Title Pertaining to Sale of Table Wine in Grocery Stores*, 646 P.2d at 923; *Spelts v. Klausing*, 649 P.2d 303, 307 (Colo.1982). *See also In re Title Pertaining to the Workers Comp Initiative*, 850 P.2d 144. This is not such a case. Instead, the indeterminacy appears to result from the multitude of provisions having separate and sometimes conflicting fiscal impacts producing an indeterminate aggregate impact. In this situation, the Board has sufficient information to assess the fiscal impact of each provision, or some provisions, in isolation. Therefore, it should state with specificity which provisions will have fiscal impacts which are capable of being estimated, and which are truly indeterminate. Each distinct provision of the proposed amendment must be addressed individually.

### V.

To conclude, we hold that: (1) the Board had the authority to set a title, ballot title and submission clause, and summary for the proposed constitutional amendment at issue, but the question of whether it would appear on the November 1993 or the November 1994 ballot is premature; (2) respondent Douglas Bruce waived his arguments that the titles set by the board are too long by not filing a timely motion for rehearing with the Board; (3) the titles as set by the Board are insufficient in that they do not state that the proposal would impose mandatory fines for willful violations of the campaign contribution and election reforms, they do not state that the proposal would prohibit certain campaign contributions from certain sources, they do not state that the proposal would make both procedural and substantive changes to the petition process, and they do not specifically list the changes to the numbers of seats in the house of representatives and the senate, but are otherwise sufficient; and (4) the summary is insufficient in that the statement of fiscal impact is not sufficiently detailed as to the expected fiscal impacts of the various parts of the propos-

al, but is otherwise sufficient. We affirm the ruling of the Board in part, reverse in part, and remand the matter to the Board with instructions.

### APPENDIX A

Proposed Initiative on "Election Reform"

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION TO RESCIND ELECTED OFFICIALS' COMPENSATION INCREASES ADOPTED AFTER 1988 WITHOUT VOTER APPROVAL AT THE END OF THEIR CURRENT TERMS OF OFFICE; TO PROHIBIT INCREASES IN COMPENSATION AND OTHER PAYMENTS TO ELECTED OFFICIALS IN EXCESS OF INFLATION UNLESS VOTER–APPROVED; TO EXCLUDE ELECTED OFFICIALS FROM PARTICIPATING IN STATE OR LOCAL GOVERNMENT PENSION PLANS; TO ENACT A TAX CREDIT FOR INDIVIDUALS WHO MAKE CASH GIFTS TO NEW CAMPAIGN COMMITTEES THAT PLEDGE TO TAKE DONATIONS ONLY FROM HUMAN BEINGS; TO LIMIT CONTRIBUTIONS THAT POLITICAL CANDIDATES, ELECTED OFFICIALS, AND THEIR CAMPAIGN COMMITTEES MAY ACCEPT FROM SPECIFIED SOURCES; TO RESTRICT THE USE OF PUBLIC RESOURCES IN CONNECTION WITH BALLOT ISSUE CAMPAIGNS; TO CHANGE THE NUMBER OF STATE LEGISLATIVE DISTRICTS AND REQUIRE THAT STATE SENATE DISTRICTS EACH CONSIST OF TWO STATE HOUSE DISTRICTS; TO PROVIDE THAT CONGRESSIONAL REDISTRICTING WILL BE PERFORMED BY THE STATE REAPPORTIONMENT COMMISSION; TO EXTEND PETITION POWERS TO RESIDENTS OF ALL POLITICAL JURISDICTIONS; TO SUBJECT JUDGES TO THE RECALL PROCESS AND BAR RECALLED JUDGES FROM ANY FUTURE JUDICIAL POSITION; TO REVISE PROCEDURAL PROVISIONS GOVERNING THE INITIATIVE, REFERENDUM, AND RECALL; TO LIMIT THE NUMBER OF BILLS EACH YEAR THAT STATE AND LOCAL GOVERNMENTS MAY EXCLUDE FROM REFERENDUM BY PETITION; TO LIMIT THE CIRCUMSTANCES UNDER WHICH PETITION SIGNATURES CAN BE FOUND INVALID; TO INVALIDATE CHANGES IN STATE PETITION LAW ADOPTED AFTER 1988 UNLESS VOTER–APPROVED; TO PLACE LIMITATIONS ON THE POWER OF GOVERNING BODIES TO AMEND VOTER–APPROVED MEASURES; AND TO AUTHORIZE INDIVIDUAL, CLASS ACTION, OR DISTRICT SUITS TO ENFORCE THE AMENDMENT.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION TO RESCIND ELECTED OFFICIALS' COMPENSATION INCREASES ADOPTED AFTER 1988 WITHOUT VOTER APPROVAL AT THE END OF THEIR CURRENT TERMS OF OFFICE; TO PROHIBIT INCREASES IN COMPENSATION AND OTHER PAYMENTS TO ELECTED OFFICIALS IN EXCESS OF INFLATION UNLESS VOTER–APPROVED; TO EXCLUDE ELECTED OFFICIALS FROM PARTICIPATING IN STATE OR LOCAL GOVERNMENT PENSION PLANS; TO ENACT A TAX CREDIT FOR INDIVIDUALS WHO MAKE CASH GIFTS TO NEW CAMPAIGN COMMITTEES THAT PLEDGE TO TAKE DONATIONS ONLY FROM HUMAN BEINGS; TO LIMIT CONTRIBUTIONS THAT POLITICAL CANDIDATES, ELECTED OFFICIALS, AND THEIR CAMPAIGN COMMITTEES MAY ACCEPT FROM SPECIFIED SOURCES; TO RESTRICT THE USE OF PUBLIC RESOURCES IN CONNECTION WITH BALLOT ISSUE CAMPAIGNS; TO CHANGE THE NUMBER OF STATE LEGISLATIVE DISTRICTS AND REQUIRE THAT STATE SENATE DISTRICTS EACH

CONSIST OF TWO STATE HOUSE DISTRICTS; TO PROVIDE THAT CONGRESSIONAL REDISTRICTING WILL BE PERFORMED BY THE STATE REAPPORTIONMENT COMMISSION; TO EXTEND PETITION POWERS TO RESIDENTS OF ALL POLITICAL JURISDICTIONS; TO SUBJECT JUDGES TO THE RECALL PROCESS AND BAR RECALLED JUDGES FROM ANY FUTURE JUDICIAL POSITION; TO REVISE PROCEDURAL PROVISIONS GOVERNING THE INITIATIVE, REFERENDUM, AND RECALL; TO LIMIT THE NUMBER OF BILLS EACH YEAR THAT STATE AND LOCAL GOVERNMENTS MAY EXCLUDE FROM REFERENDUM BY PETITION; TO LIMIT THE CIRCUMSTANCES UNDER WHICH PETITION SIGNATURES CAN BE FOUND INVALID; TO INVALIDATE CHANGES IN STATE PETITION LAW ADOPTED AFTER 1988 UNLESS VOTER–APPROVED; TO PLACE LIMITATIONS ON THE POWER OF GOVERNING BODIES TO AMEND VOTER–APPROVED MEASURES; AND TO AUTHORIZE INDIVIDUAL, CLASS ACTION, OR DISTRICT SUITS TO ENFORCE THE AMENDMENT?

The summary as prepared by the Board is as follows:

This measure terminates increases in compensation and other payments for state and local elected officials adopted after 1988 without voter approval and prohibits any future increases in such compensation and payments in excess of inflation unless voter-approved. State and local elected officials are prohibited from earning service credit under state and local pension plans after the end of their current term of office, without future voter approval.

The measure provides a tax credit for individuals who make cash gifts to new campaign committees that pledge to take donations only from human beings. Political candidates, elected officials, and their campaign committees are prohibited from accepting donations over $50 annually from specified sources, including certain regulated utilities and groups that do business with government and including any corporation, business group, employee group, political action committee other than a political party, or paid lobbyist.

The measure imposes restrictions on the use of public moneys in connection with ballot issue campaigns, including the following: A prohibition on governmental entities belonging to or giving public moneys to any organization of governmental entities or employees that supports, opposes, or distributes material discussing any ballot issue; a prohibition on the use of government resources, including elected officials' and employees' time, with a retail value over $50, to create or distribute material discussing a ballot issue, except for election and judicial processes and notices, for public meeting facility costs, and for legal duties other than ballot issue analysis; a prohibition on elected officials from voting on statements referring to ballot issues or using government resources to distribute in any calendar year more than 100 items for name recognition purposes or to suggest any political beliefs, conduct, or support.

The measure changes the number of members of the state senate from 35 to 33, changes the number of members of the state house of representatives from 65 to 66, and requires that each state senate district consist of two state house districts. It provides that congressional districts will be reapportioned by the same commission that is used for state legislative reapportionment.

The measure prohibits infringing the right to petition peaceably on public property in a place then open to the public. It extends petition powers to all political jurisdictions, and it limits the number of signatures that may be required for petitions. Judges are made subject to the recall process, and recalled judges are disqualified from any future judicial position. Recall ballots must allow statements from the petitioners and from the official. An official cannot un-

dergo more than one recall election each term, but government reimbursement of an official's campaign expenses is prohibited.

The measure requires petitions to be filed within 9 months after petitioners receive the printed petitions and requires state non-recall petitions to be filed at least 3 months before the election. Ballot title-setting is required to be available weekly and open to public comment, and any state district court is allowed to set a ballot title. Ballot title appeals are required to be filed with the state supreme court within 5 days, and the court is required to issue a decision within 10 more days. Governmental entities are required to print and deliver petitions at their expense within 10 days after final title setting in a quantity sufficient to allow at least twice the minimum number of required signatures.

The measure limits state and local governments to 8 bills each year that can be excepted from referenda by petition on the grounds of an emergency, unless voters approve an increase in such number, and the measure requires a two-thirds vote of the general assembly or local legislative body to declare an emergency exception. State measures that are open to referendum by petition can take effect no sooner than 91 days after adjournment of the general assembly, and local measures no sooner than 91 days after final publication. Measures rejected by voters may be subsequently adopted only with voter approval.

The measure creates a presumption that any person signing a petition is a registered elector whose entry is valid until disproven, and it eliminates specified circumstances as grounds for invalidating signatures. Affidavit errors and minor variances must be liberally construed to aid petitions. Unless there is a private party protest, petitions or entries may be found invalid only if detailed within 10 days after filing and only if invalid on their face. In any dispute, governmental entities and protesters have the burden of proof beyond a rea-

sonable doubt. The measure imposes a schedule to resolve protests and appeals and to allow proponents a limited opportunity to cure if insufficient signatures are found.

The measure invalidates changes in state petition law adopted after 1988 unless voter-approved, requires voter approval to amend a voter-approved initiative, and requires a four-fifths vote to refer to the voters a measure to amend an initiated constitutional or charter amendment.

The measure authorizes individual and class action suits to enforce the amendment, and allows successful plaintiffs attorney fees and costs. The measure imposes mandatory monetary penalties upon persons willfully violating the provisions limiting the acceptance of campaign contributions or the limitations on using public resources to support, oppose, or discuss ballot issues, and the measure prohibits using government funds to provide legal aid for persons charged with such violations.

Various provisions of this measure would increase costs to state or local governments, and other provisions would decrease costs. The tax credit provisions would produce annual losses to the state of from $6.7 million to $10 million, and the provisions imposing monetary penalties for certain violations would produce some additional revenue. The net effect of all of these provisions on state and local government is indeterminate at this time.

2/19/93 Rehearing

Adjourned 3:40 p.m.

## APPENDIX B

**Be it Enacted by the People of the State of Colorado:**

**Article VII, Section 2**

**Election Reform.** **(1) General provisions.** The preferred interpretation of this section shall reasonably strengthen citizen control of government the most. All provisions are self-executing and severable and supersede conflicting state constitutional, state statutory, charter, or other state or local provisions. Individual, class action, or dis-

trict enforcement suits may be filed within 3 years of an event. Factual issues are subject to a jury trial. Successful plaintiffs are allowed costs and reasonable attorney fees, but a defendant is not unless a suit be ruled frivolous.

**(2) Term definitions.** Within this section: (a) "Ballot issue" means any pending state or local referred measure or non-recall petition as soon as a ballot title has been initially set.

(b) "Compensation" means the district cost in salary, payroll fringe benefits, expense and travel accounts, and any cash payments and reimbursements to an elected official.

(c) "District" means the state or any local government, including enterprises, authorities, and all its other activities.

(d) "Donation" includes cash or cash equivalents, loans, or substitute purchases, but not contributions in kind or services.

(e) "Elected official" means a state or local non-judicial officer elected, appointed, or succeeding to an elective office.

(f) "Petition" means an initiative, referendum, or recall process, measure, or signature document, as the context may show.

(g) "Political party" means any group that nominates ballot candidates.

**(3) Pay raises.** Compensation increases adopted after 1988 without voter approval shall end with a current term of office. Compensation adopted hereafter may exceed the 1988 level only by inflation after 1988 or by district voter approval. Inflation is defined in article X, section 20. Compensation first begun, or changed by district voters, after 1988 shall use the last level and starting date. For a governing body, its combined compensation shall be used. Without future district voter approval, district pensions for elected officials shall not include service after their current term, and any non-pension compensation partly or fully exempt from state or federal income tax shall end with their current term unless required by federal law.

**(4) Campaign contributions.** (a) New local, state, or federal campaign committees may pledge to the secretary of state to take donations only from human beings. An unmarried human being, or married human beings filing a joint federal income tax return, shall receive a state income tax credit for the lesser sum of $100 or total annual cash gifts to all such pledging committees. For married human beings filing separately, the upper limit is $50. This credit shall not carry over to other tax years or exceed income tax liability. It shall be listed on all future state income tax returns and adjust yearly for inflation or more.

(b) District candidates or elected officials or their campaign committees shall not accept any donation with a retail value over $50 per calendar year per donor, or any utility service discount, from any utility with rates or service regulated by that district, from any group receiving over 5% of its annual gross receipts from that district, or from a corporation, business group, employee group, political action committee other than a political party, or paid lobbyist who is not a relative.

**(5) Election protections.** (a) No districts shall belong or donate, directly or indirectly, to any organization of districts or district employees that hereafter uses its name, or its paid employee time, material, mailings, or other resources with a retail value over $50 per calendar year, to support or oppose, or to create or distribute material discussing, a ballot issue.

(b) No elected official or district employee shall use district paid employee time, material, mailings, or other resources with a retail value over $50 per calendar year to create or distribute material discussing a ballot issue, except for election and judicial processes and notices, for public meeting facility costs, and for legal duties other than ballot issue analysis.

(c) No elected official shall vote for any district statement referring to a ballot issue, nor use district paid employee time, material, mailings, or other resources to create or distribute in any calendar year more than 100 items for name recognition

purposes or to suggest any political beliefs, conduct, or support. Replies to constituents are exempt.

(d) Each willful violator of (4) or (5) is liable for $3000 each to the district and to opposing campaign committees as a group, and jointly and severally liable to both for the retail value of district costs, savings by use of district resources, and illegal receipts. Districts shall withhold half of their net payments and refunds to violators until all amounts are paid with 10% annual simple interest. Direct or indirect repayment or legal aid with district funds is also a violation. Penalties are mandatory and not suspendable. Obeying a supervisor or elected official is no defense, nor is ignorance of this law.

**(6) Reapportionment reforms.** For all legislative reapportionments after 1998, the senate shall have 33 members and the house of representatives 66 members. Each senate area shall consist of two adjoining house of representatives areas. Congressional areas shall hereafter be reapportioned by the same commission used for state legislative areas.

**(7) Petition protections.** (a) The right to petition peaceably on district-owned property in a place then open to the public shall not be infringed. Petition powers shall apply in all districts as to district matters. Required district registered elector petition signatures shall not exceed 5% of the number of district votes for all candidates for secretary of state in the last election for that office, except local recall signatures shall not exceed 10% in a represented area. Justices and judges are subject to recall, which would bar any future judicial position. Recall ballots shall allow 250 words each for petitioners and the official. No official shall undergo more than one recall election per term, but districts shall provide no campaign reimbursement. Petitions may be filed up to 9 months after district delivery of printed petitions. State non-recall petitions shall be filed by 3 months before the election. Eligible state and local petitions filed after a deadline shall be voted on in the next following election. Ballot title-setting shall allow public comment and be available weekly. After 5 days public notice, any state district court may set a ballot title. Ballot titles may be appealed to the supreme court within 5 days, and shall be decided within 10 days more. Districts shall print and deliver petitions at their expense within 10 days after final title setting in a quantity allowing at least twice the minimum number of required signers. Petitions shall not be rejected because of district errors in form or content. Petitioners may also print petitions.

(b) Unless district voters change the number, only 8 district measures adopted in any calendar year without voter approval may be excepted as emergencies from a possible referendum petition. A 2/3 majority vote of the members of each house of the general assembly or of the local district board shall declare each exception necessary for the immediate preservation of the public peace, health, or safety. Appropriations for district support and maintenance are exempt from referendum petitions. No measure shall be fully or partly re-adopted, even with an exception, while a referendum petition on it is in progress. State measures open to a referendum petition take effect no sooner than 91 days after that final general assembly session adjourns, and such local measures no sooner than 91 days after final publication. A petition with the required number of signatures filed before the 91st day delays the effective date until the election or a final decision of petition insufficiency. Measures or parts of measures rejected by voters may be fully or partly re-adopted only with voter approval.

(c) The 1988 state petition forms shall be used in all districts unless changed by district voters or the general assembly. Invalid entries may be crossed out and do not taint valid ones. Entry of the year signed is not required, nor is an apartment, listing such as street or avenue, compass direction, postal Zip code, county, or ink color. Electors whose registration shows a postal box address may use that address. Moving within a county does not alter registration status. Affidavit errors, initials,

nicknames, abbreviations, reproduction marks, and address and other variances shall be liberally construed to aid petitions. No petition shall be renumbered. Absent a private party protest, petitions or entries may be found invalid only if detailed within 10 days after filing and only if invalid on their face. If such a protest be filed within 10 days after petition filing, petitions or entries may be found invalid only at a public hearing limited to its itemized reasons and using judicial rules of evidence and procedure. In all disputes, districts and protestors have the burdens of production and proof beyond a reasonable doubt. *A PERSON SIGNING A PETITION LATER VERIFIED OR NOTARIZED IS PRESUMED TO BE A REGISTERED ELECTOR WHOSE ENTRY IS VALID UNTIL DISPROVEN.* Results of a machine reading of entries or of district research done after a protest filing are inadmissible. Protests shall not be amended. Findings shall issue within 10 days after a protest filing. On appeal, to be filed within 5 days after findings issue, a state district court shall promptly hold a new trial, by jury if not waived, under the same standards. Verdicts may be appealed to the supreme court within 5 days, and shall be decided within 10 days more. Unless lacking enough petitions or entries valid on their face or for gross fraud, petitioners have up to 10 days after the final decision to file corrections and new entries signed at any time, to which this process shall apply. Petitions stay on the ballot during this process. A third filing is barred. Voter-approved petitions take effect unless the text of the measure be unlawful.

(d) Referred measures to amend, supersede, or repeal a petitioned constitutional or charter amendment require a 4/5 majority vote of the members of each house of the general assembly or of the local district board. Changes in state petition law adopted after 1988 without voter approval are hereby repealed. State petition laws in 1988 are restored if consistent with this section and the federal constitution. Unless adopted within 6 months after the election at which this section is approved, future state or local petition law changes require voter approval. Unless provided therein, past or future voter-approved initiatives may hereafter be amended, superseded, or repealed by elected officials only with voter approval.